## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| INFINITY CONSULTING GROUP, LLC, : <br> INFINITY CONSULTING GROUP : <br> LATIN AMERICA, APS/BOTAL : <br> STAFFING INC., ICG OF AMERICA, : <br> LLC, LUIGI FORINO AND ADAM FOX, : <br><br> Plaintiffs, : <br> : <br> : <br> AMERICAN CYBERSYSTEMS, INC., : <br> RAJIV SARDANA, individually, and : <br> NICK GOEL, individually : <br> : <br> Defendants. : | **Civil Action No.  09-1744** |

### AMENDED COMPLAINT

Plaintiffs, Infinity Consulting Group, LLC ("Infinity"), Infinity Consulting Group

Latin America "Infinity Latin America"), APS/Botal Staffing, Inc. ("APS"), ICG of

America, LLC ("ICG" and together with Infinity, Infinity Latin America and APS, the

("Infinity Entities"), Luigi Forino, an individual and Adam Fox, an individual

(collectively the "Plaintiffs" and each a "Plaintiff"), by and through their attorneys, Tuan

Olona, LLP, hereby file this complaint (the "Complaint") against defendants, American

Cybersystems, Inc., Rajiv Sardana, individually and Nick Goel, individually

(collectively, the "Defendants" and each a "Defendant"), and in support thereof avers as

follows:

### PARTIES

1.     Plaintiff Infinity is a limited liability company, formerly engaged in the

business of technology consulting, professional and administrative staffing, vendor

management and project solutions business, presently with its sole location at 235 Island Parkway, West Island Park, New York 11558-1325.

2.      Plaintiff Infinity Latin America is a company incorporated in the Dominican Republic formerly engaged in the business of professional and administrative staffing business, presently with its sole location at 235 Island Parkway, West Island Park, New York 11558-1325.

3.      Plaintiff APS is a Delaware corporation formerly engaged in the business of technology consulting, professional and administrative staffing, vendor management and project solutions business, presently with its sole location at 235 Island Parkway, West Island Park, New York 11558-1325.

4.      Plaintiff ICG is a New York limited liability company formerly engaged in the business of technology consulting, professional and administrative staffing, vendor management and project solutions business, presently with its sole location at 235 Island Parkway, West Island Park, New York 11558-1325.

5.      Plaintiffs, Luigi Forino ("Forino") and Adam Fox ("Fox") are the only principals of the above-referenced companies.

6.      Plaintiff Luigi Forino is a principal of Infinity with a location at 211 Doris Avenue, North Bellmore, New York 11710.

7.      Plaintiff Adam Fox is a principal of Infinity with his sole location at 340 East Bird Village Road, Jackson, New Jersey 08527.

8.      Defendant, American Cybersystems, Inc. ("ACS") is a Georgia corporation with an address of 100 Crescent Center Parkway, Suite 200, Tucker, Georgia 30084.

9.     Defendant Rajiv Sardana ("Sardana") is an individual and President of ACS with an address at 207 Eagles Landing Way, McDonough, Georgia 30253-4221.

10.     Defendant Nick Goel is an individual and the Controller of ACS with an address at 207 Eagles Landing Way, McDonough, Georgia 30253-4221. ACS, Sardana and Goel are collectively referred to throughout the Complaint as "Defendants."

11.     Based upon information and belief Sardana and Goel are the only principals of ACS.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this matter under 28 U.S.C. § 1332 because there is diversity of citizenship among Plaintiffs and Defendant ACS, a Georgia corporation, with a place of business located in Georgia and Defendants Sardana and Goel, are Georgia residents.

13.     This judicial district is the proper venue for this proceeding pursuant to 28 U.S.C. § 1391 because Plaintiff Infinity Entities and Forino reside in this district.

## FACTS

14.     On or about January 7, 2008, the Parties entered into an Asset Purchase Agreement (the "Contract") whereby Defendant ACS agreed to purchase the Infinity Emtities' business, including its professional and administrative staffing clientele (the "ICG Division"). See Contract attached as Exhibit "A"

15.     In consideration of receiving that business, pursuant to Section 2.4 of Contract, Defendant ACS agreed to pay Plaintiffs a cash portion at the closing and three separate earn out payments over three years after the closing in connection with the revenues generated from the clients ACS received from Plaintiffs ("Plaintiffs' Clients")

3

as well as revenues generated by staff assigned to the ICG Division from clients who were not Plaintiffs' Clients.

16.     Plaintiffs agreed to the earn out payments structure as a major part of the sales price for the ICG Division, relying upon Defendant Sardana's representations that Defendants would grow the ICG Division and that earn out payments would be much higher in the years to come.

### The Earn Out Provision

17.     Prior to executing the Contract, Defendant Sardana represented to Plaintiffs that he intended to grow the ICG Division, and pursuant to the Contract, Defendants agreed promptly after the closing of the purchase of the ICG Division, to hire four <u>additional</u> full time employees in the New York/New Jersey offices which Defendant ACS was acquiring.  Defendant Sardana also agreed to hire five <u>additional</u> full time employees devoted exclusively to the ICG Division's Dominican Republic operations.  (the "Head Count Provision").

18.     Each of the additional employees were to provide account management or recruiting services to the ICG Division in the United States or Dominican Republic offices, as the case may be.  This agreement was memorialized in Section 2.4(i) of the Contract, and was a material part of the Contract.

19.     However, after the closing of the sale and purchase of the ICG Division, Defendants did not hire <u>any</u> additional employees for the New York/New Jersey or the Dominican Republic offices or make any attempts to hire the additional employees pursuant to the Head Count Provision.  In fact, the number of staff in those locations dedicated to the ICG Division has significantly declined since the closing.

20.     The Head Count Provision was a vital clause to the Contract because the amount of employees servicing the ICG Division is directly attributable to the revenue generated each year and used to calculate the earn out payments.

21.     Plaintiff Fox repeatedly requested permission as Vice President of ACS after the Closing to hire additional staff for the New York/New Jersey office as well as the Dominican Republic, but he was consistently rebuffed by Defendant Sardana.

22.     Not only have Defendants decreased the operations of the ICG Division, they have repeatedly misrepresented to Plaintiffs that Defendant ACS is in compliance with the Contract.

23.     On January 29, 2008, Defendant Sardana emailed Plaintiff Forino with a list of only 17 employees purportedly servicing the ICG Division.  Not only was that number below the 21 employees required under the Contract, most of the individuals included on the list were not exclusively servicing the ICG Division.

24.     To exacerbate Defendants' breach, upon information and belief, Defendant Sardana fraudulently included many individuals who were not at all or only periperiphally involved with the ICG Division.

25.     On March 31, 2009, Defendant Goel fraudulently sent to Plaintiff Forino a list of employees purporting to be under the headcount, when such individuals were not full time employees working for the ICG Division or in some cases not working at all in the ICG Division.  Defendant Goel fraudulently claimed that such list was in response to the request for additional assurances.

**The Additional Assurances Provision**

26.     Section 16.13 of the Contract also provides Additional Assurances to which:

> [e]ach party agrees that it will, at any time before and after the Closing, execute and deliver all additional documents, and do any other acts or things that may be reasonably requested by the other party in order to further or better effectuate or evidence the terms hereof, all as reasonably requested by such other party and all without expense or undue hardship to such other party.

27.     Under cover of letter dated February 17, 2009, Infinity requested that Defendant ACS provide written additional assurances that it was in compliance with the Head Count Provision.

28.     Despite the February 17th letter and several other requests for written additional assurances, Defendant ACS has refused to employ the agreed-to employees or to provide assurance that it will comply with the Head Count Provision.

**The Earn Out Payments**

29.     In or around March 2009, Defendant ACS issued its first earn out payment to Plaintiffs.  Without notice, Defendant ACS withdrew $87,218.85 from that payment for purported claims which Defendant ACS claims Plaintiff Infinity owes to it.

30.     Pursuant to Section 2.6 of the Contract, written notice with a thirty (30) day period to cure any breach had to be provided prior to any right of Defendant ACS to offset any charges against the earn out. No such written notice was provided by Defendant ACS to Plaintiff Infinity.

31.     Not only does Plaintiff Infinity dispute any such set-off, Defendant ACS has refused to detail why the $87, 218.85 set-off is proper in this case.

**The Dispute Resolution Regarding Earn-Out Calculation**

32.     On page 12 of the Contract, under the heading "Dispute Resolution Regarding Earn-Out Calculation", Defendant ACS agreed that if there were any disputes as to the Earn-Out Payments, that Defendant ACS' accountants would work with Plaintiff Infinity's accountants to resolve such disputes:

> "If there should be any disagreement between Sellers and Buyer as to the proper computation of the Earn-Out Payments due from hereunder, Sellers' accountant and Buyers' accountant shall undertake to reach agreement as to the correct amounts payable and shall promptly notify Sellers and Buyers in writing as to such agreement."

33.     Upon information and belief, Plaintiffs believe that the earn out calculations for the first payment is grossly understated and represents only a fraction of the amount owed to them pursuant to the Contract.  Upon receipt of the earn out amount, Plaintiffs requested Defendant ACS' cooperation to resolve the differences in the proper computation of the Earn-Out payments.

34.     Despite repeated requests by Plaintiff Infinity's accountant to contact Defendant ACS' accountant pursuant to the Dispute Resolution Regarding Earn-Out Calculation, Defendants have refused all requests to meet and compute the proper Earn-Out Payment.  On December 18, 2009, Defendants' attorney, Kevin Watters, Esq. of McGuire Woods LP sent an electronic mail communication confirming that Defendant ACS would not be cooperating with the Dispute Resolution process for the Earn-Out in breach of Section 2.4(j) of the Contract.

**The Emazzanti Case**

35.     On or about June 30, 2008, Mazzanti, Inc., d/b/a Emazzanti Technologies, filed a complaint against Plaintiffs in the Superior Court of New Jersey for breach of

contract relating to certain computer services provided to Defendant ACS after Defendant
ACS took possession of Plaintiffs' assets under the Contract.

36.    Pursuant to the Contract, Emazzanti's contract was specifically included in
the assets purchased by Defendant ACS from the Infnity Entities.

37.    Also pursuant to the Contract, Defendant ACS agreed to indemnify
Plaintiffs for any and all claims, including reasonable attorneys' fees and other costs of
litigation arising out of, or resulting from, the operation of the business after the closing
date of that agreement.

38.    Based on the Contract, Plaintiff Infinity filed a third-party complaint
against Defendant ACS seeking indemnification for the Emazzanti action.

39.    The parties ultimately agreed, and placed on the record, that they would
settle the Superior Court of New Jersey case by Defendant ACS paying Emazzanti the
full amount of its invoice and that Plaintiff Infinity was reserving the right to pursue its
claim for attorneys' fees relating to that case in the present action.

40.    Defendant ACS stated on the record that it would not resist the claims
relating to the attorneys for the New Jersey matter based on that state's entire controversy
doctrine.

## COUNT I
### (Breach of Contract)

41.    Plaintiffs repeat and reallege Counts 1 through 38 above as if same were
set forth fully at length herein.

42.    The earn out payments formed the basis of Plaintiffs' decision to sell their
assets to Defendant ACS and the primary consideration by Defendant ACS.

43.     Pursuant to the Contract, Defendant ACS agreed to employ the above-number of employees for the ICG Division to ensure that the earn out payments would be consistent with the Parties' expectations and projections.

44.     By refusing to employ the proper number of employees, Defendant ACS breached its Contract with Plaintiffs causing resultant damage.

45.     By withdrawing funds without notice or explanation from the first earn out payment, Defendant ACS breached its contract with Plaintiffs.

46.     By refusing to allow its accountant to work with Plaintiff Infinity's accountant to calculate the proper earn out figure, Defendant ACS breached its contract with Plaintiffs.

**WHEREFORE**, plaintiffs, Infinity Consulting Group, LLC, Infinity Consulting Group Latin America, APS/Botal Staffing, Inc., ICG of America, LLC, Luigi Forino and Adam Fox hereby demand judgment against defendant, American Cybersystems, Inc., in an amount to be determined at trial, together with attorneys' fees, costs of suit and such other relief as the Court deems equitable and just.

## COUNT II
### (Fraud)

47.     Plaintiffs repeat and realleges Counts 1 through 44 above as if same were set forth fully at length herein.

48.     Plaintiffs relied on Defendant ACS to hire the additional staff for the ICG Division and to grow the business.

49.     Defendant Sardana, by deceit, caused Plaintiffs to enter into the Contract by misrepresenting that Defendant ACS would grow the ICG Division during the relevant earn out periods knowing that Defendant ACS had no intention of doing so.

50.     As a result, Defendant Sardana fraudulently induced Plaintiffs to enter into the Contract.

**WHEREFORE**, plaintiffs, Infinity Consulting Group, LLC, Infinity Consulting Group Latin America, APS/Botal Staffing, Inc., ICG of America, LLC, Luigi Forino and Adam Fox, demand judgment against Defendant Sardana, in an amount to be determined at trial, together with punitive damages, attorneys' costs of suit and such other relief as the Court deems equitable and just.

**COUNT III**
**(Fraud)**

51.     Plaintiffs repeat and reallege Counts 1 through 48 above as if same were set forth fully at length herein.

52.     Defendants Sardana and Goel fraudulently misrepresented to Plaintiffs Forino and Fox on several occasions that Defendant ACS was in compliance with the Head Count Provision by providing false lists of employees at Defendant ACS meeting the requirements of the Head Count Provision.

53.     Plaintiffs relied on Defendants Sardana and Goel's representations that Defendant ACS was in compliance with the Head Count Provision and that Defendant ACS was growing the ICG Division.

54.     Thereafter, Plaintiffs realized that Defendant ACS were in breach of the Head Count Provision and that the first earn out payment was materially less than it should have been.

**WHEREFORE**, plaintiffs, Infinity Consulting Group, LLC, Infinity Consulting Group Latin America, APS/Botal Staffing, Inc., ICG of America, LLC, Luigi Forino and Adam Fox, demand judgment against Defendants Sardana and Goel, in an amount to be

determined at trial, together with punitive damages, attorneys' costs of suit and such other relief as the Court deems equitable and just.

## COUNT IV
### (Breach of Contract)

55.    Plaintiffs repeat and reallege Counts 1 through 52 above as if same were set forth fully at length herein.

56.    Pursuant to the Contract, Defendant ACS was required to provide Plaintiff Infinity notice of any claims against Plaintiff Infinity.  To date, Plaintiff Infinity has not received notice of any claims to which Defendant ACS is entitled to reimbursement.

57.    On or about March 31, 2009, Defendant ACS made an earnout payment, but deducted the sum of $87,218.85 claiming that such deduction were for amounts owed by Plaintiff Infinity to Defendant ACS.

58.    Defendant ACS' setoff was a breach of the Contract.

**WHEREFORE**, plaintiffs, Infinity Consulting Group, LLC, Infinity Consulting Group Latin America, APS/Botal Staffing, Inc., ICG of America, LLC, Luigi Forino and Adam Fox hereby demand judgment against defendant American Cybersystems, Inc., in an amount to be determined at trial, together with attorneys' fees, costs of suit and such other relief as the Court deems equitable and just.

## COUNT V

### (Breach of covenant of good faith and fair dealing)

59. Plaintiffs repeat and reallege Counts 1 through 56 above as if same were set forth fully at length herein.

60. The above acts of Defendants are in contravention of the covenant of good faith and fair dealing.

11

**WHEREFORE**, plaintiffs, Infinity Consulting Group, LLC, Infinity Consulting Group Latin America, APS/Botal Staffing, Inc., ICG of America, LLC, Luigi Forino and Adam Fox, demand judgment against defendants, American Cybersystems, Inc., Rajiv Sardana and Nick Goel in an amount to be determined at trial, together with attorneys' costs of suit and such other relief as the Court deems equitable and just.

## COUNT VI

### (Unjust Enrichment)

61. Plaintiffs repeat and reallege Counts 1 through 58 above as if same were set forth fully at length herein.

62. By maintaining less staff in the ICG Division then Defendant ACS was required to maintain during the term of the Contract, the first earnout payment as well as subsequent earnout payments will be lower due to the lower revenues. Therefore, Defendant ACS has paid and will pay less than the fair market value for the assets of the Infinity Entities, and Defendant ACS has been unjustly enriched to the detriment of Plaintiffs.

**WHEREFORE**, plaintiffs, Infinity Consulting Group, LLC, Infinity Consulting Group Latin America, APS/Botal Staffing, Inc., ICG of America, LLC, Luigi Forino and Adam Fox, demand judgment against defendants, American Cybersystems, Inc., Rajiv Sardana and Nick Goel, in an amount to be determined at trial, together with attorneys' costs of suit and such other relief as the Court deems equitable and just.

> **TUAN OLONA, LLP**
> Attorneys for Plaintiffs
> Infinity Consulting Group, LLC
> Infinity Consulting Group Latin America,
> APS/Botal Staffing Inc.
> ICG of America, LLC
> Luigi Forino
> Adam Fox
>
> Wesley Bridges
> 820 Alexander Road, Suite 150
> Princeton, New Jersey 08543
> (P) (609) 951-9520
> (F) (609) 951-0270

Dated: February 4, 2010

# Exhibit A

**ASSET PURCHASE AGREEMENT**

# TABLE OF CONTENTS

Page

1.   SALE AND PURCHASE OF PURCHASED ASSETS............................................2
    1.1   Purchased Assets...........................................................................................2
    1.2   Excluded Assets and Excluded Liabilities.................................................2
    1.3   Assumed Liabilities.......................................................................................3
    1.4   Free and Clear Title.......................................................................................4

2.   PURCHASE PRICE.......................................................................................5
    2.1   Aggregate Purchase Price..........................................................................5
    2.2   Cash Consideration......................................................................................5
    2.3   Promissory Note............................................................................................7
    2.4   Earn-Out..........................................................................................................7
    2.5   Allocation of Purchase Price.....................................................................13
    2.6   Offsets to payments under Promissory Note and Earn-Out Payments.........13

3.   CLOSING..............................................................................................14
    3.1   Closing..........................................................................................................14
    3.2   Closing Deliveries of Sellers and Principals............................................14
    3.3   Closing Deliveries of Buyer.......................................................................16

4.   OBLIGATIONS OF SELLERS..............................................................~~16~~**17**
    4.1   Significant Client Contracts...............................................~~16~~**17**
    4.2   Workers' Compensation Insurance...........................................................17
    4.3   Conduct of Business....................................................................................17
    4.4   No Related Party Payment.........................................................................18
    4.5   No Negotiation..............................................................................................18
    4.6   Employment of Staff...................................................................................18
    4.7   Employment of Principals..........................................................................19
    4.8   Assignments.................................................................................................19
    4.9   Conveyances of Assets................................................................................19
    4.10  Licenses and Permits..................................................................................19

5.   ACCOUNTS PAYABLE/RECEIVABLE/REFUNDS.......................~~19~~**20**
    5.1   Limited Assumption of Liabilities..............................~~19~~**20**
    5.2   Client Billing................................................................................................20
    5.3   Client Payments and Claims......................................................................20

6.   ADJUSTMENTS, PRO-RATIONS AND REIMBURSEMENTS.........................20
7.   REPRESENTATIONS AND WARRANTIES OF SELLERS...........~~20~~**21**
    7.1   Corporate Status, Title, Assumed Contracts, Ownership of Purchased
        Assets, Operation of Business...................................................................21
    7.2   Undisclosed Liabilities/Legal Compliance..............................................22
    7.3   Title to and Condition of Property/Status of Assumed Contracts...............23

-i-

**TABLE OF CONTENTS**
(continued)

Page

| | | | |
|---|---|---|---|
| | 7.4 | Taxes | 24 |
| | 7.5 | Accuracy of Information and Disclosure | 25 |
| 8. | | REPRESENTATIONS AND WARRANTIES OF BUYER | 26 |
| | 8.1 | Organization and Authority | 26 |
| | 8.2 | Authority Relative to Agreement | 26 |
| | 8.3 | Consents and Approvals/No Violation | 26 |
| | 8.4 | Legal Proceedings | 26 |
| | 8.5 | Solvency | 26 |
| | 8.6 | Prior Lienholders | ~~26~~27 |
| 9. | | SURVIVAL OF REPRESENTATIONS AND WARRANTIES/ INDEMNITIES | ~~26~~27 |
| | 9.1 | Survival of Representations and Warranties | ~~26~~27 |
| | 9.2 | Indemnification by Sellers | 27 |
| | 9.3 | Indemnification by Buyer | 27 |
| | 9.4 | Indemnification Process | 27 |
| | 9.5 | Punitive Damages, Subrogation | 28 |
| | 9.6 | Claim Against Escrow | 28 |
| 10. | | CONDITIONS TO THE BUYER'S OBLIGATION TO CLOSE | 28 |
| | 10.1 | Accuracy of Representations | ~~28~~29 |
| | 10.2 | Seller Party Performance | ~~28~~29 |
| | 10.3 | Consents | 29 |
| | 10.4 | No Proceedings | 29 |
| | 10.5 | No Conflict | 29 |
| | 10.6 | Governmental Authorizations | 29 |
| | 10.7 | Employees | 29 |
| | 10.8 | Interim Financial Statements | 29 |
| | 10.9 | Contracts Upon Other Than Normal Terms and Conditions | 29 |
| | 10.10 | Material Adverse Change | ~~29~~30 |
| | 10.11 | CMI Acquisition | ~~29~~30 |
| | 10.12 | Collateral Security | 30 |
| 11. | | CONDITIONS PRECEDENT TO SELLER'S OBLIGATION TO CLOSE | 30 |
| | 11.1 | Accuracy of Representations | 30 |

-ii-

\
\
\
\
\
~~\4925356.10~~
\
\4925356.11

**TABLE OF CONTENTS**
(continued)

Page

| | | | |
|---|---|---|---|
| | 11.2 | The Buyer's Performance | 30 |
| | 11.3 | No Injunction | 30 |
| | 11.4 | CMI Acquisition | 30 |
| | 11.5 | Collateral Security | ~~30~~**31** |
| 12. | | TERMINATION | ~~30~~**31** |
| | 12.1 | Termination Events | ~~30~~**31** |
| | 12.2 | Effect of Termination | 31 |
| 13. | | POST CLOSING OBLIGATIONS AND COOPERATION | 31 |
| | 13.1 | Buyer Obligations for Hired Employees | 31 |
| | 13.2 | Sellers' Obligations for Pre-Closing Employees | ~~31~~**32** |
| | 13.3 | Access to Information | 32 |
| | 13.4 | Transition Assistance | 32 |
| | 13.5 | Change of Names | 32 |
| | 13.6 | Agreement Regarding New York Leased Real Property | 32 |
| 14. | | BROKERS, ADVISORS AND CONSULTANTS | ~~32~~**33** |
| 15. | | NEGATIVE COVENANTS—COVENANT AGAINST COMPETITION/CONFIDENTIALITY/REMEDIES | 33 |
| | 15.1 | Covenant Against Competition and Solicitation | 33 |
| | 15.2 | Confidentiality | 34 |
| | 15.3 | Remedies for Breaches of Section 15 | 35 |
| 16. | | MISCELLANEOUS PROVISIONS | 36 |
| | 16.1 | Notices | 36 |
| | 16.2 | Remedies | 36 |
| | 16.3 | Successors and Assigns | 37 |
| | 16.4 | No Partnership | 37 |
| | 16.5 | Expenses | ~~37~~**38** |
| | 16.6 | Headings/Captions; Construction | ~~37~~**38** |
| | 16.7 | Governing Law | 38 |
| | 16.8 | Jurisdiction and Venue | 38 |
| | 16.9 | Counterparts | 38 |
| | 16.10 | Time of Essence | 38 |
| | 16.11 | Severability | 38 |

-iii-

\
\
\
\
\
~~\4925356.10~~
\
**\4925356.11**

**TABLE OF CONTENTS**
(continued)

**Page**

16.12   Waiver..................................................................................................38
16.13   Additional Assurances.......................................................................39
16.14   Entire Agreement...............................................................................39
16.15   Amendments......................................................................................39
16.16   Public Announcements......................................................................39
16.17   Confidentiality of Transaction.........................................................39
16.18   No Third Party Beneficiaries........................................................~~39~~**40**
16.19   Consultation with Legal Counsel.....................................................40

-iv-

\
\
\
\
\
~~\4925356.10~~
\
\4925356.11

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this document and all exhibits attached hereto shall be referred to herein as the "**Agreement**") is made and entered into effective this 7th day of January, 2008 (the "**Effective Date**"), by and among **INFINITY CONSULTING GROUP, LLC.**, a New York limited liability company ("**Infinity**"), **INFINITY CONSULTING GROUP LATIN AMERICA**, a Dominican Republic company ("**Infinity DR**"), **APS/BOTAL STAFFING INC.**, a New York corporation ("**APS**"), and **ICG OF AMERICA, LLC**, a New York limited liability company ("**ICG**"; together with Infinity, Infinity DR and APS, are collectively referred to as the "**Sellers**" and individually as a "**Seller**"), with headquarters of each Seller at 450 7th Avenue, 44th Floor, New York, NY 10123, **LUIGI FORINO** ("**Forino**"), a resident of 235 Island Parkway, Island Park, New York 11558 and **ADAM B. FOX** a resident of 340 East Bird Village Road, Jackson NJ 08527 ("**Fox**"), (Forino and Fox are collectively referred to as the "**Principals**") and **AMERICAN CYBERSYSTEMS, INC.**, a Georgia corporation, with an address of 100 Crescent Center Parkway, Suite 200, Tucker, Georgia  30084 (hereinafter referred to as "**Buyer**"). (Buyer and Seller Parties are sometimes hereinafter referred to collectively as the "**parties**" and individually as a "**party**")

### W I T N E S S E T H :

WHEREAS, Sellers own and operate an information technology consulting, professional and administrative staffing, vendor management and project solutions business (the "Business") with offices at 450 7th Avenue, 44th Floor, New York, NY 10123, 4400 Route 9 South, Freehold, NJ 07728 and Calle Jose Del Carmen Ariza; Esquina Mella #8; 3rd Piso Puerto Plata, Republica Dominicana (collectively, the "**Locations**").

WHEREAS, Sellers collectively desire to sell to Buyer all right, title and interest in and to substantially all of the assets of the Business (the "**Purchased Assets**") and to assign to Buyer certain contracts related to the operation of the Business (the "**Assumed Contracts**");

WHEREAS, Principals (collectively with Sellers, the "**Seller Parties**" and each a "**Seller Party**") desire Sellers to sell to Buyer the Purchased Assets and assign to Buyer the Assumed Contracts from and after the Closing Date (as defined in Section 3), and are further willing to become a party to this Agreement for the sole purpose of entering into certain covenants not to compete or solicit or disclose confidential information as described in Section 15 hereof and making certain acknowledgments and agreements as set forth herein;

WHEREAS, Buyer desires to purchase all of Sellers' right, title and interest in and to the Purchased Assets and to assume the rights and obligations of Sellers in and under the Assumed Contracts from and after the Closing Date on the terms and conditions herein set forth; and

WHEREAS, Buyer deems Principals to be essential parties to this Agreement, and Buyer deems the covenants not to compete/solicit and the obligations of confidentiality as set forth in Article 15 hereof and acknowledgements and agreements of the Principals as essential consideration to be received by Buyer hereunder, and Buyer would not enter into this Agreement but for the agreement and performance by Principals of their agreements and undertakings as expressly set forth in Section 15 hereof and elsewhere in this Agreement.

NOW, THEREFORE, in consideration of such sale and assignment and of the foregoing and of the mutual agreements hereinafter set forth, the parties hereto do hereby agree as follows:

1.**Sale and Purchase of Purchased Assets**

1.1**Purchased Assets.**  Upon the terms and subject to the conditions set forth in this Agreement, Sellers shall: (i) sell, transfer and convey to Buyer, and Buyer shall purchase, free and clear of any and all liens, claims and encumbrances, all right, title and interest in and to the Purchased Assets described in **Exhibit "A"** attached hereto and (ii) assign to Buyer all of Sellers' rights and obligations arising under and related to the Assumed Contracts from and after the Closing Date as referred to and as set forth in **Exhibit "B"** attached hereto.

1.2**Excluded Assets and Excluded Liabilities.**  Excluded from the sale under this Agreement are the following assets of Sellers (collectively, the "**Excluded Assets**"), which shall remain the sole property of Sellers:

(a)rights and obligations under Assumed Contracts related to the period prior to the Closing Date and all liabilities not expressly assumed pursuant to this Agreement, including but not limited to any liability for taxes, or relating to payroll, vacation, sick leave, workers' compensation, unemployment benefits, pension benefits, severance, termination, or retention payments for any employee, consultant, or former employee or consultant of any Seller or any litigation described on Schedule 7.2(b) hereto (the "**Excluded Liabilities**");

(b)each Seller's minute books, seals, stock record books, stock certificates and other similar corporate documents that are not necessary for the Buyer to operate the Business; all personnel and employment records that do not relate solely to employees of Sellers hired by Buyer at Closing; records relating to returns of taxes, including all supporting schedules, for taxes accruing on or before the Closing, provided that upon reasonable request, before or after the Closing, Sellers will promptly provide Buyer with copies thereof;

(c)all rights and claims against third parties in respect of the Excluded Assets and Excluded Liabilities, including without limitation all rights under express or implied warranties or indemnity obligations from suppliers and/or customers or other third parties to a Seller and all other claims, rebates, payments from vendors and refunds to the extent the foregoing relate solely to any Excluded Asset or Excluded Liability;

(d)all assets of any employee benefit plan maintained by any Seller and all assets segregated or set aside for payment of benefit claims or satisfaction of liabilities arising under any such employee benefit plan;

(e)all permits pertaining to the Business that, pursuant to their terms or pursuant to applicable law, are not transferable;

(f)other than the Accounts Receivable (as defined in Section 5.2 hereof) all rights and claims against third parties in respect of the Purchased Assets or the operation of the Business prior to Closing;

(g)all loans from a Seller to one or both of Principals or other amounts payable by a Seller to one or both of Principals;

(h)any amounts payable to Jonathan Gazdak pursuant to employment, termination, severance or other arrangements; and

(i)all other assets of Sellers not specifically included in the Purchased Assets, including but not limited to rights under insurance policies, rights to receive tax refunds, the charter of each Seller, taxpayer identification numbers, minute books, seals and other documents relating to the existence of Sellers and the rights of Sellers under the Agreement.

1.3**Assumed Liabilities**.  Buyer shall assume, and hereby agrees to assume (the "**Assumed Liabilities**"):

(a)all obligations of Sellers under the Assumed Contracts related to the period following the Closing Date but only to the extent such liability or obligation is not based on an event, act, omission or occurrence prior to the Closing Date;

(b)all obligations of Sellers under the following Leases (together, the "**Space Leases**" and individually, a "**Space Lease**"):

(i)that certain Lease dated as of _____, _____, by and between Infinity, as tenant, and _____, as landlord, for the premises at 450 7th Avenue, 44th Floor, New York, NY 10123 (the "**New York Location**");

(ii)that certain Lease dated as of _____, ____, by and between Infinity, as tenant, and **Freehold-Craig Road Partnership**, as landlord, for the premises at 4400 Route 9 South, 2nd Floor, Freehold, NJ 07728; and

(iii)that certain Lease dated as of _____, ____, by and between **Infinity Consulting Group Latin America**, as tenant, and **Alberto Noesi, C. POR A.**, as landlord, for the premises at Calle Jose Del Carmen Ariza; Esquina Mella #8; 3rd Piso Puerto Plata, Republica Dominicana;

(c)any trade account payable (other than a trade account payable to a Related Person) that remains unpaid at and is not delinquent as of the Effective Time and that is either reflected on Schedule 1.3 attached hereto or incurred by Sellers in the ordinary course of business between the date of such Schedule 1.3 and the Effective Time (the "**Assumed Payables**");

(d)obligations of Sellers incurred in connection with the CMI Acquisition, but only to the extent, if any, as expressly assumed by separate written agreement of Buyer (not including this Agreement).

(For purposes of this Agreement, the phrase "**Related Person**") means (a) with respect to an individual, each Principal, each other member of such Principal's family, any person or entity directly or indirectly controlled by one or more members of such individual's family; and any

- 3 -

entity for which one or more members of such individual's family serves as a director, manager, officer, partner, stockholder, member, executor or trustee; and (b) with respect to any person other than an individual, each Seller, any person or entity that directly or indirectly controls, is controlled by or under common control with such person, each person that serves as a director, manager, officer, partner, member, stockholder, executor or trustee of such person, or any person or entity that serves as a general partner or trustee of any such entity.)

1.4 **Free and Clear Title.**   The sale and purchase of the Purchased Assets described herein is and shall be made free and clear of any and all payroll taxes, penalties, liens, encumbrances, security interests, liabilities and obligations of every nature and description, including, but not limited to, liability for taxes including, without limitation, income, payroll, and ad valorem taxes and all penalties or other obligations of any nature of or incurred by any of Sellers and Principals arising out of or related to any event, act, omission or occurrence prior to the Closing Date or obligations incurred prior to the Closing Date.   Except for the Assumed Liabilities and subject to Section 4.6 herein, Sellers shall be responsible for all liabilities and obligations of the Business arising prior to the Closing Date to the extent related to the period prior to Closing, including, but not limited to, the payment of rent and all expenses related to the Space Leases, the payment of all salaries, wages, commissions, bonuses and all other compensation of employees of any Seller, the payment of federal and state payroll and unemployment taxes, the payment and handling of all workers' compensation and other claims and loss retentions in respect of insured losses, the payment of all "self-insured" claims for occupational injuries and illnesses, the payment of all insurance premiums related to the operation of the Business prior to Closing, the payment of claims for unemployment compensation or benefits under the Consolidated Omnibus Budget Reconciliation Act ("COBRA") or Family Medical Leave Act ("FMLA") filed by employees of any Seller who are terminated by any Seller prior to Closing and the payment of all other expenses related to the operation of the Business prior to Closing.   Sellers shall also be and remain responsible for all costs, expenses, damages and claims of every kind and nature (including the defenses thereof) related to or in connection with all liabilities or obligations of any Seller to process any payroll for any client for which money has been deposited with such Seller on or prior to Closing except to the extent that such deposit has been transferred to Buyer or Buyer has been given credit for such deposit pursuant to the pro-ration provisions of Section 6 below. Buyer shall be responsible for all liabilities and obligations of the Business arising from and after the Closing and related to the period following Closing, including, but not limited to, the payment of rent and all expenses related to the Space Leases, the payment of all salaries, wages, commissions, bonuses and all other compensation of employees of any Seller who are hired by Buyer for work performed after the Closing, the payment of federal and state payroll and unemployment taxes, the payment and handling of all workers' compensation and other claims and loss retentions in respect of insured losses, the payment of all "self-insured" claims for occupational injuries and illnesses, the payment of all insurance premiums related to the operation of the Business following Closing, the payment of claims for unemployment compensation or benefits under COBRA or FMLA filed by employees of any Seller who are hired by Buyer and then terminated by Buyer, and the payment of all other expenses related to the operation of the Business following Closing.

**2.Purchase Price**

**2.1Aggregate Purchase Price.**  The purchase price for the Purchased Assets shall consist of four components: (a) cash consideration as described below (the "**Cash Consideration**"); (b) a Promissory Note as described below (the "**Promissory Note**"); and (c) an Earn-Out (as described in Subsection 2.4) based upon the performance of the Business as measured by Business Gross Profit (as defined herein) for a three (3)-year period from January 1, 2008 until December 31, 2010; and (d) the assumption of the Assumed Liabilities (collectively, the "**Purchase Price**"). Components (a) and (c) of the Purchase Price shall be payable to Infinity, for itself as a Seller and as agent for the other Sellers, with the understanding that Sellers will apportion and distribute such component payments among themselves.  Component (b) (Promissory Note) shall be payable to Escrow Agent under the Escrow Agreement.

**2.2Cash Consideration.**  The Cash Consideration payable to Sellers shall be Four Million and 00/100 Dollars ($4,000,000.00) minus the Net Working Capital Adjustment.

> **(a)Net Working Capital Adjustment.**

> > **(i)**The term "**Net Working Capital**" means the net book value as of the Closing Date of (i) the trade accounts receivable and cash and cash equivalents of Sellers included in the Purchased Assets minus (ii) the Assumed Payables, as determined in accordance with Generally Accepted Accounting Principles ("**GAAP**"). The Net Working Capital of Sellers as of August 31, 2007 was One Hundred Twenty Thousand Four Hundred Seventy-Five and 80/100 Dollars ($120,475.80) (the "**Initial Net Working Capital Amount**").

> > **(ii)**The term "**Net Working Capital Adjustment**" (which may be a positive number) will be equal to the amount, if any, by which the Final Net Working Capital is less than the Initial Net Working Capital.

> > **(iii)Final Net Working Capital.**  As soon as practicable, but no later than sixty (60) days following the Closing Date, Sellers shall prepare and deliver to Buyer a statement (the "**Final Net Working Capital Statement**"), setting forth the Net Working Capital of Sellers as of the Closing Date (the "**Final Net Working Capital**").

> > **(iv)Protest Notice.**  Within thirty (30) days following delivery of the Final Net Working Capital Statement, Buyer may deliver written notice (the "**Working Capital Protest Notice**") to Infinity, in care of Sellers, of any disagreement that Buyer may have as to any amount included in or omitted from the Final Net Working Capital Statement.  Such Working Capital Protest Notice shall set forth in reasonable detail the basis of such disagreement together with the amount(s) in dispute.  The failure of Buyer to deliver such Working Capital Protest Notice within the prescribed time period will constitute Buyer's acceptance of the Final Net Working Capital Statement as determined by Sellers.  Buyer and its representatives shall be given reasonable access to all of Sellers' books and records relating to the

- 5 -

Final Net Working Capital Statement during reasonable business hours for the purpose of verifying the Final Net Working Capital Statement.

(v)**Resolution of Protest**.  If Buyer and Sellers are unable to resolve any disagreement as to any amount included in or omitted from the Final Net Working Capital Statement within fifteen (15) days following Infinity's receipt of the Working Capital Protest Notice, then the amounts in dispute will be referred to an accountant or accounting firm mutually acceptable to Sellers and Buyer (the "**Accountants**") for final arbitration within forty-five (45) days after submitting the matter to the Accountants, which arbitration shall be final and binding on Buyer and each Seller Party.  The Accountants shall act as an arbitrator to determine, based solely on presentations by Buyer and Sellers, and not by independent review, only those amounts still in dispute.  Buyer and Seller Parties agree to execute, if requested by the Accountants, a reasonable engagement letter.  The fees and expenses of the Accountants shall be shared equally between Buyer, on the one hand and Sellers, on the other hand.  The term "**Final Net Working Capital Statement**," as used in this Agreement, shall mean the definitive Final Net Working Capital Statement accepted by Buyer or agreed to by Sellers and Buyer in accordance with Section 2.2(a)(iii) or the definitive Final Net Working Capital Statement resulting from the determinations made by the Accountants in accordance with this Section 2.2(a)(v) (in addition to those items theretofore accepted by Sellers or agreed to by Sellers and Buyer).

(vi)**Reimbursement of Overpayment at Closing**.  Sellers shall pay to Buyer, within fifteen (15) days of the determination of the Final Closing Net Working Capital Statement pursuant to Section 2.2(a)(v), by wire transfer of immediately available funds to an account designated by Buyer the amount of the Net Working Capital Adjustment, plus interest thereon at the Applicable Rate from the Closing Date to the date such payment is made pursuant to this clause (vi).

(b)**Payment of Cash Consideration at Closing**.  At Closing, Buyer shall pay Sellers in cash the sum of Four Million Dollars ($4,000,000) by wire transfer of immediately available funds as follows:

(i)Seven Hundred Thousand Dollars ($700,000), plus payments by Buyer under the Promissory Note, to be held on behalf of Sellers pursuant to, and subject to, the provisions of an Escrow Agreement (the **Escrow Agreement**") among Sellers, Buyer and SUNTRUST BANK (the "**Escrow Agent**") in form and substance satisfactory to Buyer and Sellers; and

(ii)The balance to Sellers at such account or accounts as designated by Sellers.

The Parties agree that the Escrow Agreement shall provide that on and after the first anniversary of the Escrow Agreement, Escrow Agent shall release the sum of Two Hundred Thousand Dollars ($200,000) upon the complete and final settlement,

- 6 -

judgment or dismissal, all with prejudice, in form and substance acceptable to Sellers and Buyer (which consent shall not be unreasonably withheld or delayed), of any litigation or claims outstanding against Sellers and that Escrow Agent shall retain all other amounts in and as deposited by Buyer pursuant to the Escrow Agreement pending release as described in such Escrow Agreement, with all costs of such Escrow Agreement to paid by Sellers.

**2.3** **Promissory Note**.  At Closing, Buyer shall sign and deliver to Sellers a Promissory Note in the amount of Five Hundred Thousand and 00/100 Dollars ($500,000) payable in equal monthly installments over a thirty-six (36) month period, beginning April 1, 2008, at an interest rate of seven percent (7%) per annum, in the form attached hereto as **Exhibit "C"**.  During the term of the Escrow Agreement, as defined therein, Buyer's payments under the Promissory Note shall be paid to Escrow Agent to be held and released pursuant to the Escrow Agreement.

**2.4** **Earn-Out**.

(a) **Description**.  Following the Closing and as additional consideration for the Purchased Assets, Sellers shall be entitled to receive from Buyer (subject to the terms and conditions set forth in this Section 2.4) additional amounts based on the performance of the Business during (i) the twelve-month period from January 1, 2008 through December 31, 2008 (the "**First Earn-Out Period**"), (ii) the twelve-month period from January 1, 2009 through December 31, 2009 (the "**Second Earn-Out Period**") and (iii) the twelve-month period from January 1, 2010 through December 31, 2010 (the "**Third Earn-Out Period**," and together with the First Earn-Out Period and the Second Earn-Out Period, the "**Earn-Out Periods**").  The amount (if any) paid with respect to (A) the First Earn-Out Period (the "**First Earn-Out Payment**"), (B) the Second Earn-Out Period (the "**Second Earn-Out Payment**") and (C) the Third Earn-Out Period (the "**Third Earn-Out Payment**," and together with the First Earn-Out Payment and the Second Earn-Out Payment, the "**Earn-Out Payments**") shall be determined in accordance with this Section 2.4(b) and shall be paid to Sellers pursuant to the terms of Section 2.4(c) below.

(b) **Amount**.  The amount of the Earn-Out Payments shall be determined as set forth in this Section 2.4(b):

(i) The First Earn-Out Payment shall be an amount equal to the Base Earn-Out for the First Earn-Out Period multiplied by 1 less any Quarterly Advance Earn-Out Payment received with respect to any calendar quarter in the First Earn-Out Period.

(ii) The Second Earn-Out Payment shall be an amount equal to the Base Earn-Out for the Second Earn-Out Period multiplied by 1.33 (the "**Second Payment Multiplier**") less any Quarterly Advance Earn-Out Payment received with respect to any calendar quarter in the Second Earn-Out Period.

(iii) The Third Earn-Out Payment shall be an amount equal to the Base Earn-Out for the Third Earn-Out Period multiplied by 1.5 (the "**Third Payment**

- 7 -

**Multiplier**") less any Quarterly Advance Earn-Out Payment received with respect to any calendar quarter in the Third Earn-Out Period.

(c)**Payment**.  Upon Buyer's verification of the amount of the applicable Earn-Out Payment, the Earn-Out Payments shall be paid by Buyer to Sellers, by wire transfer of immediately available funds to an account or accounts designated by Sellers, as follows:

(i)The First Earn-Out Payment shall be paid on or before March 31, 2009.

(ii)The Second Earn-Out Payment shall be paid on or before March 31, 2010.

(iii)Fifty-six percent (56%) of the Third Earn-Out Payment shall be paid on or before March 31, 2011, fourteen percent (14%) of the Third Earn-Out Payment shall be paid on or before June 30, 2011, fifteen percent (15%) of the Third Earn-Out Payment shall be paid on or before September 30, 2011 and fifteen percent (15%) of the Third Earn-Out Payment shall be paid on or before December 31, 2011.

(d)**Quarterly Advance Earn-Out Payment.**  In the event that the Business Gross Profit for any calendar quarter in any Earn-Out Period is greater than One Million Dollars ($1,000,000), within thirty (30) days following the end of such quarter Buyer shall pay to Sellers, by wire transfer of immediately available funds to an account or accounts designated by Sellers, an amount equal to Sixty Thousand Dollars ($60,000) as an advance earn-out payment (each a "**Quarterly Advance Earn-Out Payment**").

(e)**Reimbursement by Sellers**.  In the event that any Earn-Out Payment calculated in Section 2.4(b) above is a negative number, the absolute value of such negative number shall be paid by Sellers to Buyer, by wire transfer of immediately available funds to an account or accounts designated by Buyer, within thirty (30) days of the end of the Earn-Out Period for which such negative Earn-Out Payment was calculated.  Each Seller Party shall be jointly and severally liable for any payments to be made by Sellers pursuant to this Section 2.4(e).

(f)**Contract Right to Earn-Out Payments.**  The right of Sellers to receive any Earn-Out Payment (i) is solely a contractual right and is not a security for purposes of any federal or state securities laws (and shall confer upon Sellers only the rights of a general (un)secured creditor under applicable state law); (ii) will not be represented by any form of certificate or instrument; (iii) does not give any Seller any dividend rights, voting rights, liquidation rights, preemptive rights or other rights common to holders of Buyer's capital stock; (iv) is not redeemable; and (v) may not be sold, assigned, pledged, gifted, conveyed, transferred or otherwise disposed of (a "**Transfer**"), except by operation of law or pursuant to the laws of descent and distribution (and any Transfer in violation of this Section 2.4(g) shall be null and void).

(g)**Conditions to Earn-Out Payments**.  Notwithstanding anything to the contrary contained in this Agreement, following the occurrence of any of the following events, all Earn-Out Payments, including any Quarterly Advance Earn-Out Payment, otherwise due and payable by

- 8 -

Buyer pursuant to this Agreement after the occurrence of such event shall be forfeited by the Sellers or reduced by Buyer as follows:

(i)Any failure of any Seller Party to agree (which agreement shall not be unreasonably withheld or delayed) to terms of any subordination or intercreditor agreement requested by any financial institution that is not an Affiliate of Buyer(s) now or hereafter providing senior, secured financing to the Buyer or any Affiliate which in the aggregate, is commercially reasonable to Seller Party in the protection of its security interest and which shall not be materially worse than the terms and conditions of the intercreditor agreement to be executed with SunTrust Bank on the Closing, or the failure of any such Seller Party to abide by the terms of any such subordination or intercreditor agreement, then all (100%) of all Earn-Out Payments otherwise payable to Sellers from the date of such failure or breach shall be forfeited by Sellers;

(ii)Any breach by any Seller Party of the non-compete or non-solicitation covenants contained in Section 15.1 hereof or material breach of the Confidentiality covenants contained in Section 15.2 hereof shall result in the following adjustment: (A) in the event of any breach by Forino, directly or indirectly, as set forth above then seventy-three percent (73%) of all Earn-Out Payments otherwise payable to Sellers from the date of such breach shall be forfeited by Sellers ; (B) in the event of any breach by Fox, directly or indirectly, as set forth above then twenty-five percent (25%) of all Earn-Out Payments otherwise payable to Sellers from the date of such breach shall be forfeited by Sellers and (C) in the event of any breach by any Seller, directly or indirectly, as set forth above then all (100%) of all Earn-Out Payments otherwise payable to Sellers from the date of such breach shall be forfeited by Sellers; or

(iii)The termination of the Fox Employment Agreement prior to the first anniversary date of the Closing Date by Executive without Good Reason, death or disability (as defined in the Fox Employment Agreement) or by Company for 'cause' (as defined in the Fox Employment Agreement), other then pursuant to 6.1.1.7, then all (100%) of all Earn-Out Payments otherwise payable to Sellers from the date of such termination shall be forfeited; provided however that seventy-three percent (73%) of all Earn-Out Payments otherwise payable to Sellers from the date of such termination shall be paid to Sellers if Forino shall assume and perform all obligations of Fox pursuant to the Fox Employment Agreement up to the day before the first anniversary of the Closing Date;

(iv)The termination of the Fox Employment Agreement after the first anniversary date of the Closing Date for "cause" pursuant to Sections **6.1.1.1. or** 6.1.1.3 of the Fox Employment Agreement, then twenty-five percent (25%) of all Earn-Out Payments otherwise payable to Sellers from the date of such termination shall be forfeited by Sellers; or

- 9 -

(v)Subject to the foregoing subclauses (iii) and (iv), the termination of the Fox Employment Agreement by Executive without 'Good Reason', death or disability (as defined in the Fox Employment Agreement), after the first anniversary date of the Closing Date but before the second (2nd) anniversary date of the Closing Date then twenty-five percent (25%) of all Earn-Out Payments otherwise payable to Sellers shall be forfeited during the period from that date upon which Fox ceases performing services under such Fox Employment Agreement and six months after Executive's notice of termination, all pursuant to Section 6.2.2.2 of the Fox Employment Agreement

(h)**Definitions**.  For purposes of this Section 2.4, the following terms have the meaning set forth below:

(i)"**Base Earn-Out**" means, with respect to any Earn-Out Period, (i) the Tranche 1 Yearly GP for such Earn-Out Period multiplied by zero (0) plus (ii) the Tranche 2 Yearly GP for such Earn-Out Period multiplied by fifteen percent (15%) plus (iii) the Tranche 3 Yearly GP for such Earn-Out Period multiplied by thirty-five percent (35%) plus (iv) the Tranche 4 Yearly GP for such Earn-Out Period multiplied by fifteen percent (15%) plus (v) the Tranche 5 Yearly GP for such Earn-Out Period multiplied by ten percent (10%) plus (vi) the Tranche 6 Yearly GP for such Earn-Out Period multiplied by five percent (5%).

(ii)"**Business Cost of Revenue**" means, without duplication, all costs and expenses related to the Business Revenue, including, without limitation, all consultant related expenses, all payroll expenses, payroll and other employment related taxes, workman's compensation and other insurance (but excluding errors & omissions and general liability insurance) bought or maintained to support consulting assignments, fringe benefits, expenses incurred on or paid to Business consultants or contractors and all hardware and software expenses incurred in connection with earning the Business Revenue.  Business Cost of Revenue shall also include (i) all direct or indirect payments to Goran Komarica or any affiliate of Goran Komarica and the earn-out payments made to the sellers of Computer Managers, Incorporated ("**CMI**") in connection with the "CMI Acquisition" as defined in Section 3.2(h) hereof, (ii) beginning on the first anniversary of the Closing Date, all commission amounts paid to Steve Sayetta and other related expenses in connection with permanent placements made by Steve Sayetta, and (iii) all costs and expenses incurred in connection with any upgrade or enhancement to the ProView vendor management software included in the Purchased Assets ("**ProView**").

(iii)"**Business Revenue**" means, without duplication, (i) the revenue of the Business, including revenue from the assets of CMI acquired in the CMI Acquisition, (ii) any revenue of Buyer generated by the recruiters and account managers of Sellers that are hired by Buyer, (iii) any revenue of Buyer associated with sales of ProView, and (iv) revenue related to the new staffing business

- 10 -

generated from Alcatel, Xcel Energy, ConAgra Foods, CH2M Hill, Northrop Grumman and DST after Closing.

(iv)**Business Gross Profit**" means the Business Revenue minus the Business Cost of Revenue, calculated by Buyer in a consistent manner as it calculates Gross Profit for its general operations (beyond the ICG Division) except for such changes or exceptions identified in this Agreement as to the ICG Division or Business.

(v)"**Tranche 1 Yearly GP**" means the Business Gross Profit for any Earn-Out Period of up to Two Million Dollars ($2,000,000).

(vi)"**Tranche 2 Yearly GP**" means the Business Gross Profit for any Earn-Out Period above Two Million Dollars ($2,000,000) but less than or equal to Two Million Five Hundred Thousand Dollars ($2,500,000).

(vii)"**Tranche 3 Yearly GP**" means the Business Gross Profit for any Earn-Out Period above Two Million Five Hundred Thousand Dollars ($2,500,000) but less than or equal to Four Million Dollars ($4,000,000).

(viii)"**Tranche 4 Yearly GP**" means the Business Gross Profit for any Earn-Out Period above Four Million Dollars ($4,000,000) but less than or equal to Six Million Dollars ($6,000,000).

(ix)"**Tranche 5 Yearly GP**" means the Business Gross Profit for any Earn-Out Period above Six Million Dollars ($6,000,000) but less than or equal to Twenty Million Dollars ($20,000,000).

(x)"**Tranche 6 Yearly GP**" means the Business Gross Profit for any Earn-Out Period above Twenty Million Dollars ($20,000,000).

(i)**Operations During Earn-Out Period**.   Buyer agrees that for financial accounting purposes, it will account for the Business as a separate division or department of Buyer at all times during the Earn-Out Period (the "**ICG Division**").  Within thirty (30) days from the Closing Date and through-out the Earn-Put Period, Buyer shall allocate the revenues and expenses of the following Buyer clients, including expenses of key employees servicing such clients, to the new ICG Division:  Alcatel, Xcel Energy, ConAgra Foods, CH2M Hill, Northrup Grumman, and DST.  Buyer agrees to (a) promptly following the Closing Date, hire or engage four additional individuals to provide account management or recruiting services in the United States; (b) promptly following the Closing Date, hire or engage five additional individuals to provide account management or recruiting services in the Dominican Republic; and (c) during the Earn-Out Period, maintain the direct staff headcount of the Business at no less than the number of direct, full-time employee staff equivalents (meaning one staff person working a full-time work schedule for one year) as in effect on November 7, 2007, minus one (attributable to Forino), but plus the new hires described in the foregoing clauses (a) and (b).  Any additional staff of CMI that is hired by Buyer

- 11 -

shall not be included in the foregoing headcount calculations without the prior consent of Infinity, on behalf of Sellers, and Buyer.

(j)**Dispute Resolution Regarding Earn-Out Calculation**.  If there should be any disagreement between Sellers and Buyer as to the proper computation of the Earn-Out Payments due from Buyer hereunder, Sellers' accountant and Buyer's accountant shall undertake to reach agreement as to the correct amounts payable and shall promptly notify Sellers and Buyer in writing as to such agreement.  Any such agreement by such accountants shall be conclusive and binding on the parties hereto and judgment thereon may be entered in any court of applicable jurisdiction.  If within twenty (20) business days after the matter is referred to them, the accountants of Sellers and Buyer are unable to agree as to the correct amounts payable, such accountants jointly shall promptly select an independent certified public accounting firm to serve as a third accountant (the "**Third Accountant**").  The Third Accountant shall, within twenty (20) business days after the matter is referred to it, notify Sellers and Buyer in writing of its determination of the correct amounts.  Any such determination by the Third Accountant shall (a) not be less than the amounts as determined by Buyer's accountant nor be greater than the amounts as determined by the Sellers' accountant, and (b) be conclusive and binding on the parties hereto.  Judgment thereon may be entered in any court having applicable jurisdiction.  The fees and expenses of the Third Accountant, and all other costs associated with any dispute in which a Third Accountant is appointed, shall be paid by the non-prevailing party in the resolution procedure set forth above, provided that each Seller and Buyer shall be responsible for its own attorneys' fees, accountants' fees and other expenses incurred in connection with the dispute.  For purposes of this provision, the non-prevailing party shall be considered to be the party whose proposed amount differs the most, in the aggregate, from the amount determined by the Third Accountant.  Sellers agree to jointly engage one accountant to act on behalf of Sellers in connection with any dispute resolution hereunder.

(k)**Acknowledgement by Seller and Principals**.  Each Seller Party acknowledges that Buyer makes no warranties or representations regarding the amount of the Earn-Out Payments which could or will become payable hereunder or whether any Earn-Out Payments will be payable hereunder.

(l)**Collateral Security for Earn-Out Payment.**  As collateral security for the payment of any Earn-Out Payments and the Promissory Note, Buyer shall, solely upon the consent of the "Prior Lienholders" (as hereinafter defined), grant Sellers a lien in the Purchased Assets acquired by Buyer hereunder, with the understanding that payment of such amounts and lien shall be subordinate to payments and liens in favor of SunTrust Bank, such other persons holding a lien on all assets of Buyer on the date hereof, and any subsequent lenders to the Company that provide senior, secured debt financing (collectively, "**Prior Lienholders**").  Such lien in the Purchased Assets in favor of Sellers shall be granted pursuant to a Security Agreement and related documents, in form and substance acceptable to Sellers, Buyer and such Prior Lienholders (the "**Security Agreement**"), which Security Agreement shall provide that all Liens in favor of Sellers shall terminate, automatically and without further action, on July 7, 2011, provided that all amounts owing to Sellers as ~~if~~of such date under the Note and Earn-Out Payments are paid.

- 12 -

**(m)Failure to Pay Earn-Out Payment, Quarterly Advance Earn-Out Payment and/or the Occurrence of an Event of Default under the Promissory Note.** Subject to Sections 2.4 (g), 2.4 (j) and 2.6 herein, Buyer agrees that (i) its failure to make any Earn-Out Payment or Quarterly Advance Earn-Out Payment as required under this Section 2.4 where there is no dispute as to the amount of such payment within thirty (30) days after written notice by Sellers of such failure or (ii) an event of default under Section 3 of the Promissory Note after the expiration of any applicable cure periods, shall relieve Seller Parties of all obligations under Section 15.1 (Covenant against Competition and Solicitation) without any reduction or elimination of any other rights or obligations of any Seller Party or Buyer under this Agreement and any Transaction Document; provided, however, that in the event the payment of any such Earn-Out Payment would create or increase any material financial hardship of Buyer which material financial hardship shall be as reasonably determined by Sellers upon provision of proof by Buyer, then Sellers agree to provide Buyer an additional thirty (30) days to make such payment provided that such payment shall provide for interest at a per annum rate equal to the Prime Rate as quoted by the Wall Street Journal from time to time. Buyer and Seller Parties acknowledge and agree that, notwithstanding anything in this Agreement or any Transaction Documents to the contrary, should the Seller Parties be relieved of their obligations under Section 15.1 pursuant to this clause 2.4(m), such Seller Parties shall be free to use or disclose their general industry knowledge or information about the Business acquired prior to the Closing, but shall not use or disclose any Confidential Information, including trade secrets, about the Business or Buyer, including but not limited to any Confidential Information as defined in the Fox Employment Agreement.

**2.5Allocation of Purchase Price**. The Purchase Price will be allocated among the Purchased Assets and Assumed Liabilities (the "**Allocation**") as shall be mutually agreeable by the Sellers and Buyers in writing prior to Closing. Buyer and each Seller Party shall (i) be bound by the Allocation for all tax purposes; (ii) prepare and file all tax returns in a manner consistent with the Allocation; and (iii) take no position inconsistent with the Allocation in any tax return, any proeeeding before any taxing authority or otherwise. In the event that the Allocation is disputed by any taxing authority, the party receiving notice of such dispute shall promptly notify and consult with the other party and keep the other parties apprised of material developments concerning resolution of such dispute.

**2.6Offsets to payments under Promissory Note and Earn-Out Payments.**

All payments by Buyer to Sellers under the Promissory Note, Earn-Out Payments or any agreement to be executed and delivered in connection with this Agreement ("**Transaction Documents**") shall be subject to offset for (i) any breach by a Seller Party of any term or provision in Section 15.1 hereof, or (ii) any material breach of any term or provision of Section 15.2 hereof or (iii) any breach of any representations and warranties in this Agreement or any Schedule or Exhibit attached hereto or any Transaction Document or any breach by a Seller Party of any covenant, agreement or obligation of a Seller Party in this Agreement or any Transaction Document to be performed after the Closing Date, including but not limited to Section 13.6 hereof, which breach described in subclause (iii) is not cured within thirty (30) days after written notice thereof from Buyer. Further, in the event of any claim, indemnification, or breach by CMI or any selling or other party to all or any aspect of the CMI Acquisition ("**CMI Affiliate**"), Buyer agrees

\4925356.10
\4925356.11

to first hold-back or reduce any and all earn-out or contingent payments otherwise payable to CMI or such CMI Affiliate under the documents governing the CMI Acquisition and to next hold-back or reduce any Earn-Out Payments to Sellers hereunder to the extent attributable to the CMI Acquisition, with no further hold-back or reduction in any other Earn-Out Payments to Sellers hereunder except to the extent attributable to the CMI Acquisition.  Nothing in this Agreement or any Transaction Documents is intended to or shall in any way limit Buyer's right to recover damages and seek other relief from any or all of CMI, CMI Affiliate, Sellers and/or Principals to the extent it is otherwise entitled to same.

**3.Closing**

     **3.1Closing.**   Subject to the conditions set forth herein, the consummation of the transactions that are the subject of this Agreement (the "**Closing**") shall occur at the offices of McGuireWoods LLP, Suite 2100, 1170 Peachtree Street NE, Atlanta, GA or such other place as Buyer and Sellers may mutually agree upon in writing, at 10:00 a.m., Atlanta time, on a date specified by Buyer and Sellers but no later than two (2) business days after the satisfaction or waiver of the conditions set forth in Sections 10 and 11 hereof (other than conditions that by their nature are to be satisfied at the Closing) and the Closing shall be deemed effective as of the open of business on the Closing Date.  The date on which the Closing actually occurs is herein referred to as the "**Closing Date**."

     **3.2Closing Deliveries of Sellers and Principals**.  At the Closing, the Seller Parties will execute and deliver or cause to be executed and delivered, as applicable, to Buyer:

          (a)**Assignment and Bill of Sale**.  An assignment and bill of sale for the Purchased Assets, substantially in the form and to the effect of Exhibit D attached hereto (the "**Assignment and Bill of Sale**")

          (b)**Payoff Letters and Lien Discharges**.  A payoff or other letter, in form and substance acceptable to Buyer, from each holder of any lien or encumbrance on any of the Purchased Assets, indicating that upon payment of a specified amount such holder shall release its security interest and agree to execute Uniform Commercial Code Termination Statements, or such other documents or endorsements necessary to release of record the security interests of such holder, and evidence of the release or discharge of such financing statements, judgments, or other liens on or against the Purchased Assets, in form and substance satisfactory to Buyer;

          (c)**Assignment of Propriety Rights**.   An assignment of Proprietary Rights (including, without limitation, patent, trademark, and copyright assignments, if any) from the applicable Seller in form and substance satisfactory to Buyer;

          (d)**Corporate Resolutions**.  Certified copies of the resolutions of the shareholders or members and Board of Directors or Managers, as applicable, of each Seller approving the transactions contemplated by this Agreement and the Transaction Documents;

          (e)**Fox and Forino Employment Agreements**.   An executed employment agreement from each of Fox (the "Fox Employment Agreement") and Forino (the "Forino

- 14 -

Employment Agreement" and collectively, with the Fox Employment Agreement, the "Principal Employment Agreements") in form and substance as acceptable to Buyer and each such person, and such employment agreements shall be in full force and effect as of the Closing;

(f)**Assignment of Linale, Elia, Newman, and Derek Brightman Employment Agreements**. The assignment of the written employment or consulting agreements, in form and substance satisfactory to Buyer, of Mario Linale and Peter Elia with ICG, and of Gary Newman and Derek Brightman and each such employment or consulting agreement shall be in form and substance acceptable to Buyer and in full force and effect as of the Closing;

(g)**Assignment of CMI documents**.   The assignment, in form and substance satisfactory to Buyer, of all rights and obligations of Sellers in connection with the purchase of assets from CMI on terms and conditions acceptable to Buyer, in its sole discretion (the "**CMI Acquisition**"), including but not limited to all indemnity and other rights of such Sellers against CMI or any seller parties or affiliates thereof in connection with such CMI Acquisition or, if the CMI Acquisition has been consummated before Closing, the assignment, without additional Purchase Price, of all assets and obligations acquired in connection with the CMI Acquisition on terms and conditions acceptable to Buyer, in its sole discretion;

(h)**Certificates of Title**. Certificates of title, duly endorsed to Buyer for transfer, of all automobiles and other vehicles included in the Purchased Assets;

(i)**Good Standing Certificates**. Certificates, dated not more than ten business days prior to the Closing Date, of any state of the United States or any other jurisdiction where any Seller is qualified to do business providing that the applicable Selling Entity is in good standing;

(j)**Security Agreement.**   The Security Agreement and all documents related thereto, in form and substance acceptable to Buyer, Sellers and the Prior Lienholders, signed by Sellers.

(k)**Third Party Consents**.   Copies of all "Mandatory Consents" identified on Schedule 4.1 and other consents and approvals from Governmental Authorities, whether federal, state or local shall have been obtained, and a copy of each such consent or approval shall have been provided to Buyer at or prior to the Closing;

(l)**Lease Assignments**. Assignments in forms reasonably satisfactory to Buyer, assigning Sellers' rights and obligations under the Space Leases, duly executed by the applicable Seller or, absent such an assignment, a valid sublease in form and substance acceptable to Buyer and upon economic terms equivalent to an assignment with respect to any leased premises under a Space Lease for which an assignment cannot be obtained;

(m)**Factored A/R Confirmation**.   Confirmation and agreement between Buyer, Sellers and Madison Resource Funding , in form and substance reasonably satisfactory to Buyer, regarding the amount (adjusted for customer discounts), settlement and other terms of trade accounts receivable that have been factored by Madison Resource Funding as of the Closing Date

- 15 -

and the termination of such factoring arrangement as of the Effective Time, or as of the close of business on December 29, 2007 should the Closing occur on or prior to January 11, 2008;

(n)**Closing Certificate**.   A closing certificate executed on behalf of Sellers confirming the matters referred to in Sections 4, 5 and 10 hereof;

(o)**Escrow Agreement.**  The Escrow Agreement signed by Sellers;

(p)**Allocation of Purchase Price.**  The allocation of Purchase Price as required and agreed upon by Sellers and Buyer pursuant to Section 2.5.

(q)**Other Documents**.  Such other documents, instruments or writings required to be delivered by a Seller Party to Buyer at or prior to the Closing pursuant to this Agreement and such other documents and instruments as Buyer or its counsel reasonably shall deem necessary to consummate the transactions contemplated hereby.  All documents delivered to Buyer shall be in form and substance reasonably satisfactory to Buyer.

**3.3**<u>**Closing Deliveries of Buyer**</u>.  At the Closing, Buyer will execute and deliver or cause to be executed and delivered, as applicable, to Sellers:

(a)**Cash Consideration**.  The Cash Consideration payable at Closing under Section 2.2(b) hereof;

(b)**Escrow Agreement.**  The Escrow Agreement signed by Buyer;

(c)**Security Agreement.**   The Security Agreement and all documents related thereto, in form and substance acceptable to Buyer, Sellers and the Prior Lienholders, signed by Buyer;

(d)**Allocation of Purchase Price.**  The allocation of Purchase Price as required and agreed upon by Sellers and Buyer pursuant to Section 2.5;

(e)**Promissory Note**.  The Promissory Note;

(f)**Other Documents.**  Such other documents, instruments or writings required to be delivered by Buyer to Sellers at or prior to Closing pursuant to this Agreement, and such other documents and instruments as Sellers and their counsel reasonably shall deem necessary to consummate the transactions contemplated hereby.  All documents delivered to Sellers shall be in form and substance reasonably satisfactory to Sellers.

**4.**<u>**Obligations of Sellers.**</u>

**4.1**<u>**Significant Client Contracts**</u>.   Sellers shall use their respective commercially reasonable efforts to obtain, prior to Closing, written consents from each of the clients listed in the "Mandatory Consents" column of Schedule 4.1 hereto and within ninety (90) days after Closing, written consents of all other clients of Sellers or CMI or both listed on Schedule 4.1 (collectively

- 16 -

with the clients requiring Mandatory Consents, the "**Significant Clients**") concerning the assignment to Buyer of any contract which Seller has with any such clients. Alternatively, Sellers' obligation under this Paragraph 4.1 can be satisfied by Buyer's entering into new contracts with any such clients. Subject to Sections 10.3 and 3.2 hereof, in the case that Sellers are unable, despite their respective commercially reasonable efforts, to obtain within ninety (90) days after Closing any Assumed Contracts which by their terms or by virtue of their subject matter are not assignable without the consent of a third party (collectively, the "**Non-Assignable Contracts**"), then Buyer shall not have any liability or obligation to Sellers, such third party or any other party with respect to such Non-Assignable Contract except as set forth below. In the event that Closing occurs and any Non-Assignable Contract has not been assigned to Buyer for any reason within ninety (90) days after the Closing Date, then Sellers shall use their respective commercially reasonable efforts to enter into an arrangement to provide Buyer the benefits of such Non-Assignable Contract, including pursuant to a management agreement in form and substance mutually agreeable to Sellers and Buyer. If Sellers shall have made such arrangements acceptable to Buyer with respect to any Non-Assignable Contract, Buyer will assume the obligations under such Non-Assignable Contract to be performed on and after the Effective Time and will perform and fulfill such obligations as though such Non-Assignable Contract has been assigned to Buyer. In that event, Buyer shall receive all economic and other benefits under such Non-Assignable Contracts. If Sellers, after complying with their obligations set out above, cannot enter into an arrangement to provide Buyer the economic and other benefits of a Non-Assignable Contract, then Sellers, if so requested by Buyer, shall have the right to take all action necessary to terminate the Non-Assignable Contract in accordance with its terms.

**4.2** **Workers' Compensation Insurance**. Each Seller has provided information to Buyer prior to Closing of its claims history and losses for workers' compensation for the years 2003, 2004, 2005, 2006 and 2007 to date, to the extent such Seller was an Affiliate of any Seller or Principal.

**4.3** **Conduct of Business**. Between the Execution Date of this Agreement and the Closing, Sellers will:

(**a**) conduct the Business only in the ordinary course of business, except that Sellers shall be permitted to acquire up to 47% of the outstanding shares of APS from remaining shareholders and 2% of the shares of Infinity from John Bonade, acquire CMI in the CMI Acquisition pursuant to terms acceptable to Buyer, in its sole discretion, and may enter into the employment or consulting agreements pursuant to Section 3.2 (g) hereof;

(**b**) except as otherwise directed by Buyer in writing, and without making any commitment on Buyer's behalf, use their respective commercially reasonable efforts to preserve intact their current business organizations, keep available the services of their officers, employees and agents and maintain their relations and good will with suppliers, customers, landlords, creditors, employees, agents and others having business relationships with Sellers or any of them;

(**c**) confer with Buyer prior to implementing operational decisions of a material nature;

(d) maintain the Purchased Assets in a state of repair and condition that complies with Legal Requirements and is consistent with the requirements and normal conduct of Sellers' Business;

(e) keep in full force and effect, without amendment, all material rights relating to Sellers' Business;

(f) otherwise report periodically to Buyer concerning the status of the business, operations and finances of Sellers; and

(g) use their respective commercially reasonable efforts to cause the conditions in Section 10 hereof to be satisfied.

**4.4 No Related Party Payment.** From August 31, 2007 until the Effective Time, Sellers shall not make any payment or distribution to a Related Person other than for base compensation payable to such Related Person in the ordinary course of business for bona fide work performed for a Seller, including but not limited to any payment or distribution in connection with any bonuses, incentive compensation, separate but related transaction or transactions affecting another business entity or any of its assets or securities and to any indebtedness for money borrowed, including payables, retirement liabilities and guaranties.

**4.5 No Negotiation**. Until such time, if any, as this Agreement is terminated pursuant to Section 12 hereof, Sellers and Principals will not, and will cause each of its officers, directors, managers, employees, agents, consultants, advisors, legal counsel and other representatives to not, directly or indirectly solicit, initiate, encourage or entertain any inquiries or proposals from, discuss or negotiate with, provide any nonpublic information to or consider the merits of any inquiries or proposals from any person (other than Buyer) relating to any business combination transaction involving any Seller (other than the CMI Acquisition), including the sale of such Seller's business or any of the Purchased Assets (other than in the ordinary course of business). Sellers will notify Buyer of any such inquiry or proposal within twenty-four (24) hours of receipt or awareness of the same by any Seller.

**4.6 Employment of Staff**. Sellers shall be fully responsible, up to 11:59 p.m. on the day immediately preceding the Closing Date (the "**Effective Time**"), for the employment of each of their respective staff, temporary and temp-to-hire employees and for the payment of all salary, wages, commissions, and reimbursements for all business expenses actually incurred up to the Effective Time, and Sellers shall be responsible for paying all federal and state payroll and unemployment taxes up to the Effective Time. Principals shall assist Buyer in offering new employment with Buyer to Sellers' employees and in transitioning to Buyer those employees who accept such offer; provided, however, that neither Sellers nor Principals make any representation or warranty regarding whether an employee of the Business will agree to continue as an employee after Closing. Buyer agrees that it will offer employment to all staff and temporary employees of the Business effective as of 12:00 a.m. on the Closing Date on such terms as desired by Buyer. Sellers and Principals acknowledge that Buyer is an "at will" employer and that all of its staff and temporary employees are "at will" employees and that any representation to the contrary to any potential employee of Buyer would be misleading. In the event that the Closing occurs on or

- 18 -

before January 11, 2008, Buyer agrees to pay the normal wages of Seller's employees, consultants and sub-contractors for work performed during the period from December 30, 2007 until the Closing Date so long as all revenues of Sellers and the Business for the same period are retained by Buyer.

4.7**Employment of Principals**.  At the Closing, Buyer shall enter into employment or consulting agreements with Fox, Forino and JDM Corporation in the forms to be mutually agreed upon by Buyer and such persons.

4.8**Assignments**.  On the Closing Date, Sellers shall assign and convey to Buyer the Space Leases, any equipment leases, all telephone and fax numbers, internet addresses, domains, directory listings and websites used by Sellers in the conduct of the Business and deliver to Buyer keys to the business premises governed by the Space Leases, and all file drawers, all computer user names and codes, and all premises access codes so as to enable Buyer to be able to operate computers and utilize equipment included in the Purchased Assets.  In lieu of assignment of the Space Lease for the New York Location, Sellers shall, if permitted under the terms of such lease, sublet the New York Location to Buyer, on the same terms as the original Space Lease for such New York Location.  Sellers shall execute all instruments necessary to transfer to Buyer and shall otherwise assist Buyer in acquiring all rights to telephone and fax numbers, internet addresses and domains and Sellers' corporate names, provided, however, that Sellers shall not be obligated to pay any transfer or similar fees in connection with same.  In the event that Buyer shall not desire to continue any telephone or fax numbers, websites or internet addresses of Sellers, at the request of Buyer, Sellers shall execute all instruments and take such actions as may be reasonably necessary to abandon Sellers' rights to the same.

4.9**Conveyances of Assets**.  At Closing, each Seller shall deliver the Purchased Assets and Assumed Contracts, to the extent that such are deliverable, to Buyer, and each Seller and Buyer shall execute and deliver to each other at Closing a Bill of Sale and Assignment in form attached hereto as Exhibit "D."

4.10**Licenses and Permits**.  At Closing, Sellers shall execute such documents as may be reasonably necessary to transfer to Buyer all licenses and permits pertaining to the Business to the extent the same are transferable.  Sellers make no representation or warranty of any nature whatsoever that such licenses and/or permits are transferable.

5.**Accounts Payable/Receivable/Refunds**

5.1**Limited Assumption of Liabilities.**  Except for the Assumed Liabilities, Buyer shall not assume any accounts payable, debts or other monetary obligations of Sellers or any claims against Sellers or Principals related to the operation of the Business or ownership of the Purchased Assets prior to Closing.

5.2**Client Billing.**  Sellers shall be responsible for billing and shall invoice their customers up to the Effective Time (the "**Billing Cutover Time**"): (a) for the services of all temporary employees on assignment at customers of Sellers and (b) for the placement of all direct hires actually placed with its clients as permanent or part time employees who have begun employment

- 19 -

before the Closing, provided however, that in the event the Closing occurs on or before January 11, 2008, Sellers will not bill or invoice their customers for services performed from the period of December 30, 2007 until the Closing Date.  Sellers agree that should the Closing occur on or before January 11, 2008, all revenues of the Business from or generated in the period from December 29, 2007 and thereafter shall be turned over to Buyer so long as Buyer complies with its obligations for the same period pursuant to Section 4.6 hereof. Sellers shall convey and otherwise assign to Buyer all accounts receivable of the Business as of the Closing Date except those that are factored by Madison Resource Funding (the "**Accounts Receivable**"), which Accounts Receivable are listed on Exhibit "E."  Sellers agree to not factor any Accounts Receivable or revenues of the Business after or attributable to any time after December 29, 2007 unless the Closing fails to occur for any reason on or before January 11, 2008.

   **5.3Client Payments and Claims.**  Following Closing, Sellers shall remit to Buyer any payments for services rendered by Buyer after the Effective Time.  Buyer shall remit to Sellers any refunds paid by third parties, such as customers or suppliers, relating to the conduct of the Business prior to the Closing Date.  Sellers shall be responsible for any claims by third parties, such as warranty claims, fall offs for permanent placements, or claims for refunds of placement, consulting and other fees by customers of Sellers that relate to the conduct of the Business prior to the Closing Date, except that Buyer shall be responsible for all such claims that are made by customers for which an account receivable was transferred to Buyer as part of the Accounts Receivable.  Should any Seller fail to make any such payments which it is legally obligated to make, Buyer may make such payments on such Seller's behalf and such Seller shall promptly reimburse Buyer for any such amounts so paid by Buyer.

**6.Adjustments, Pro-rations and Reimbursements**

   Subject to Section 4.6 hereof, adjustments, pro-rations and reimbursements related to the operation of the Business for the month in which Closing shall occur shall be made as of the Closing Date, prorating any prepaid or accrued expenses of the Business, including, but not limited to, utility charges, contract payments, personal property taxes, lease expenses and deposits, employee compensation and all other expenses of the Business.

**7.Representations and Warranties of Sellers**

   Sellers, jointly and severally, represent and warrant to Buyer that representations and warranties of any Seller or Sellers and the statements of any Seller or Sellers contained in this Agreement are true and correct in all material respects as of the date of this Agreement.  As a material inducement for Buyer to enter into this Agreement and to effect and close the transaction herein set forth, Sellers hereby, jointly and severally, represent, warrant and agree as follows:

   **7.1Corporate Status, Title, Assumed Contracts, Ownership of Purchased Assets, Operation of Business.**

      **(a)**This Agreement constitutes the legal, valid and binding obligation of Sellers and Principals, enforceable against each of them in accordance with its terms, except as such enforceability shall be limited by applicable bankruptcy, reorganization, insolvency, fraudulent

- 20 -

conveyance and other laws governing creditors' rights in general and except as limited by applicable principles of equity.    Infinity and ICG are each a limited liability company, duly organized, validly existing and in good standing under the laws of the State of New York.    APS is a corporation, duly organized, validly existing and in good standing under the laws of the State of Delaware.    Infinity DR is a company duly organized, validly existing and in good standing under the laws of Dominican Republic.    Sellers have all requisite power and authority to carry on their Business as now being conducted and to operate the Business in the offices demised under the Space Leases and the Purchased Assets as now owned, leased or operated, and to perform all their obligations under the agreements and instruments to which Sellers, or any of them, are a party or by bound, including, but not limited to, the Assumed Contracts.    The copies of Articles of Incorporation, bylaws and other organizational documents, as amended to date, of each Seller which have been or shall be delivered to Buyer at least two business days prior to Closing, are complete and correct and such documents as so amended are in full force and effect.    At Closing, each Seller shall deliver to Buyer resolutions duly adopted by the shareholders or members and Directors or Managers, as applicable, of such Seller authorizing the execution, delivery and performance of this Agreement by such Seller, duly certified by the corporate secretary of such Seller.

**(b)**Each Seller has the full right, power and legal authority to execute, deliver and perform this Agreement.    This Agreement has been duly executed and delivered by each Seller. Neither the execution and delivery or the performance of this Agreement by any Seller shall:  (a) result in any violation of the Articles of Incorporation or organizational document of such Seller, (b) constitute a breach of any agreement or order to which Seller is a party, (c) result in the violation of any federal, state or local law, or (d) result in the imposition or creation of any charge, equitable interest, lien, option, pledge, security interest or right of refusal with respect to the Purchased Assets.

**(c)**Neither the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby nor the compliance by any Seller with any of the provisions hereof will directly or indirectly (with or without notice or lapse of time, or both) result in a breach of or default under any of the terms, conditions or provisions of any note, contract, license, lease, pledge agreement or other obligation to which a Seller is a party or by which  a Seller or any of its respective properties or the Purchased Assets may be bound.

**(d)**Sellers at Closing shall be the sole owners of all of the Purchased Assets being sold and purchased hereunder, free and clear of all liens, security interests, encumbrances, and other liabilities and obligations.

**(e)**Sellers have delivered to Buyer true and correct copies of the Assumed Contracts and Sellers have any reason to believe that any of the Assumed Contracts are not in full force and effect.    Sellers have not received written or oral notice of default from any customer of a Seller or written notice of the intent of any customer of a Seller materially to reduce or discontinue the use of Seller's services or otherwise to curtail the level of its business with such Seller.

- 21 -

(f)No Seller has sought classification as a minority-owned or woman-owned business enterprise for the purpose of being awarded any contract or business based upon such classification.

(g)Principals will at Closing own approximately 98% of the issued and outstanding shares of Infinity, with the remaining approximately 2% owned by Mario Linale and Michael Schaab.   Infinity will at Closing own approximately 91% of APS, with the remaining approximately 9% owned by Logical Options, Inc. APS owns and will at Closing own all of ICG. Infinity owns and will at Closing own most of Infinity DR.   There are no contracts, agreements, warrants, orders or decrees in effect relating to the issuance, sale, pledge or transfer of any ownership interest in any of Sellers.

(h)Since January 1, 2002, Sellers have conducted business only under the names and marks Infinity, APS, ICG, CMI, DSL Group, and Pro Vision Solutions and no other names or marks.

(i)Since January 1, 2004, Sellers have maintained offices at only the Locations and the following locations [Tx address.]

(j)No Seller is in default under any Space Lease or under any leases or licenses for office furniture, computers, software, copiers, fax machines and other office equipment.

(k)No Seller is in default under any contract with any Significant Clients or under any of the Assumed Contracts.

(l)The Purchased Assets and Assumed Contracts are substantially all of the assets currently used by Sellers in the conduct of the Business.

7.2 **Undisclosed Liabilities/Legal Compliance.**

(a)Each Seller is in full compliance with all federal, state, local, municipal or other law, order or ordinance and each approval, consent, license or permit ("**Legal Requirements**") that is or was available to it for the conduct of the Business and the ownership of its assets other than, in each case, any such failure to be in compliance which would not have a material adverse effect on the Business.

(b)Except as disclosed on Schedule 7.2(b) hereof, to Seller's knowledge, there are no claims, lawsuits, investigations or proceedings pending, threatened against or relating to the Business or the Purchased Assets or the Assumed Contracts, nor do Sellers know of any basis for any such action.   In addition, no Seller has received notice of any condemnation proceeding in connection with the premises subject to the Space Leases and no Seller has permitted any mechanic's or materialman's or other liens to be filed against the premises subject to the Space Leases.  No Seller Party is subject to any order in which relief is sought which would prevent, delay or make illegal the transactions contemplated by this Agreement, and there are no legal proceedings pending or to the best knowledge of Sellers, threatened against a Seller Party before

- 22 -

any arbitrator, court or governmental authority which, individually or in the aggregate, would affect materially and adversely the ability of any Seller Party to perform its obligations hereunder.

(c)Neither this Agreement, nor any certificate, financial statement or document furnished or to be furnished to Buyer, its agents or representatives, by a Seller Party pursuant to this Agreement, contains or will contain, as of the date thereof, any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements therein, in light of the circumstances in which they are made, not false or misleading.

(d)The financial statements and books of account and other records of Sellers, all of which have been made available to Buyer, are complete and correct in all material respects and have been maintained in accordance with good business practices.  Schedule 7.2(d) sets forth the reviewed financial statements of Sellers as of the years ending December 31, 2005 and 2006, as well as the internally prepared statements through the period ending August 31, 2007 (the "Financial Statements").  There has been no material adverse change in the financial condition of the Business that is not reflected in the Financial Statements.

(e)All of the employee benefit plans or welfare plans of Sellers have complied in form and in operation in all material respects with the applicable requirements of the Internal Revenue Code of 1986 and the Employee Retirement Income Security Act of 1974, as amended. All contributions and insurance premiums that are due and payable in connection with a Seller's employee benefits plans and welfare plans on or before the Closing Date related to any period prior to Closing have been paid in full or will be paid in full by such Seller.

(f)There has been no material adverse change in a Seller's business relationship with Significant Clients during the two (2) year period preceding Closing.

7.3Title to and Condition of Property/Status of Assumed Contracts.

(a)Sellers will convey good and marketable title to the Purchased Assets described herein and in Exhibits "A" and "B" hereto, free and clear of any liens, mortgages, pledges, security interests, charges or encumbrances of any nature whatsoever other than the Assumed Liabilities.

(b)Sellers represent and warrant that to their actual knowledge there are no violations of zoning laws, building or fire laws, statutes or ordinances relating to the Purchased Assets and/or operation of the Business at the premises subject to the Space Leases.

(c)Except as disclosed to Buyer, no Seller is party to any service, maintenance or other similar contract relating to maintenance of the premises subject to the Space Leases.

(d)No Seller Party has received written notice within two (2) years preceding its signing of this Agreement, from any federal, state or local government agency alleging a violation with respect to any federal, state or local law, ordinance, regulation or guideline regulating or imposing standards of conduct concerning any "Hazardous Substances" and no Seller Party has received notice of any violation with respect to the Property relating to any "Hazardous Substances." The term "Hazardous Substances" as used herein shall mean any flammable

- 23 -

explosives, pollutants, contaminants, radioactive materials, hazardous wastes, hazardous air pollutants, toxic substances or related materials, including, without limitation, asbestos, PCBs, lead, mercury, arsenic, petroleum products and by-products, substances defined or listed as "hazardous substances" or "toxic substances" or similarly identified in or pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq., hazardous wastes identified in or pursuant to The Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., any chemical substance or mixture regulated under the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. Section 2601, et seq., any "toxic pollutant" under the Clean Water Act, 33 U.S.C. Section 466, et seq., any hazardous air pollutant under the Clean Air Act, 42 U.S.C. Section 7401, et seq., any federal, state or local so-called "Superfund" or "Super-lien" laws and any hazardous or toxic substance or pollutant regulated under or governed by any other federal, state or local laws (statutory and common law).

(e)Sellers (a) own all rights (either through ownership or by rights of license or other rights to use) to use the Intellectual Property (as defined in Exhibit "A") and Confidential Information (as defined in Exhibit "A") free and clear of all liens, claims and encumbrances; (b) to the best knowledge of each Seller, have not infringed, nor are infringing, upon the rights of others with respect to the Intellectual Property or the operation of the Business; and (c) have not received any written notice of conflict with the asserted rights of others with respect to any of the Intellectual Property, Confidential Information and the operation of the Business, and Seller Parties know of no basis therefor.

7.4 Taxes.

(a)Each Seller has filed or caused to be filed on a timely basis all federal, state and local tax returns that are or were required to be filed by or with respect to such Seller. Each Seller has delivered to Buyer true, complete and correct copies of all such tax returns for 2004, 2005, 2006 and 2007 to date, and no Seller has received notice or correspondence from any taxing authority with respect to such tax returns. Each Seller has properly made, reported and remitted all applicable federal, state and local payroll deductions and taxes including, FICA, FUTA, SUTA and income tax withholdings presently due and owing and all applicable sales and use taxes presently due and owing as of the date hereof.

(b)Each Seller has paid in full all tax or other liens, security interests and other encumbrances in favor of the Department of the Treasury, United States Internal Revenue Service ("IRS"), or any other federal, state or local governmental body or agency.

(c)The federal and state income tax returns of each Seller have never been audited by the IRS or any relevant state authorities. No Seller Party has ever given or been requested to give waivers or extensions (or is or would be subject to a waiver or extension given by any other person) of any statute of limitations relating to the payment of taxes of such Seller Party or for which such Seller Party may be liable. Seller Parties agree that any and all expenses connected with any audit or similar investigation by the IRS or any other state or federal governmental entity with regard to a tax return or similar document filed or to have been filed prior to the date of this

- 24 -

Agreement shall be borne in full by Seller Parties, that Buyer has not assumed any liability for such taxes, and that the liability for any taxes incurred prior to the Closing Date shall be and remain the liability of Seller Parties.

(d)All tax returns filed by each Seller are true, correct, and complete in all material respects. All material items of income, gain, loss, deduction and credit or other such items required to be included in each such tax return have been so included and all such items, any other information provided in each such tax return are true, correct and complete. All tax withholding and deposit requirements have been satisfied in full in all respects and there are no mortgages, pledges, liens, encumbrances, charges or other security interests on any of the Purchased Assets that arose in connection with any failure or alleged failure to pay any taxes, and there is no tax sharing agreement that will require any payment by a Seller after the Closing Date.

(e)Definitions. For purposes of this Agreement, "tax" or "taxes" means any tax (including any income tax, capital gains tax, value-added tax, sales tax, property tax, gift tax, or estate tax), levy, assessment, tariff, duty (including any customs duty), deficiency, or other fee, and any related charge or amount (including any fine, penalty, interest, or addition to tax), imposed, assessed, or collected by or under the authority of any federal, state or local governmental body or taxing authority or payable pursuant to any tax-sharing agreement or any other contract relating to the sharing of payment of any such tax, levy, assessment, tariff, duty, deficiency or fee.

### 7.5 Accuracy of Information and Disclosure.

Each of the Documents delivered by Sellers to Buyer in connection with Buyer's conduct of due diligence are materially true, correct and complete copies of the originals of each such Document and each such Document has not been modified, amended, superseded or otherwise modified in any material respect except as disclosed to Buyer. For purposes of this Subparagraph, "**Documents**" shall include, but shall not be limited to, office and personal property leases, licenses, certificates, registrations, pleadings, claims, citations, estimates, valuations, appraisals, returns, liens and security agreements, reports, accounts, handbooks, benefit plans, promotional materials, insurance policies, loss runs, powers of attorney, inventories, notes and loans payable and any other thing listed in this Agreement or provided by a Seller Party to Buyer in connection with Buyer's conduct of due diligence or negotiation of this Agreement. Documents shall not include any of the materials furnished to Buyer by any brokers or agents for any Seller Party, unless such materials were obtained from Sellers.

## 8. Representations and Warranties of Buyer

Buyer represents and warrants to Sellers that the statements of Buyer contained in this Article are true and correct as of the date of this Agreement. As a material inducement for Sellers and Principals to enter into this Agreement and to effectuate and close the transaction herein set forth, Buyer hereby represents, warrants and agrees as follows:

**8.1 Organization and Authority**. Buyer is a corporation, duly organized, validly existing and in good standing under the laws of the State of Georgia. Buyer has all requisite power and authority to carry on its business as now being conducted and to own, lease and operate its

- 25 -

properties as now owned, leased or operated.  The copies of Buyer's Articles of Incorporation and bylaws, as amended to date, which have been delivered to Sellers are complete and correct and such instruments as so amended are in full force and effect.

     **8.2Authority Relative to Agreement**.  Buyer has the full right, power and legal authority to execute, deliver and perform its obligations under this Agreement.  This Agreement has been duly executed and delivered by Buyer, and is a valid and binding Agreement of Buyer, enforceable against Buyer in accordance with its terms.

     **8.3Consents and Approvals/No Violation**.  Neither the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, nor the compliance by Buyer with any of the provisions hereof, will result in a breach of or default under, any of the terms, conditions or provisions of any note, contract, license, lease, pledge agreement or other obligation to which Buyer is a party or by which Buyer or any of its respective properties or the Purchased Assets may be bound.

     **8.4Legal Proceedings**.  Buyer is not subject to any order in which relief is sought which would prevent, delay, or make illegal the transactions contemplated by this Agreement, and there are no legal proceedings pending or threatened against Buyer before any arbitrator, court or governmental authority which, individually or in the aggregate, would affect materially and adversely Buyer's ability to perform its obligations hereunder.

     **8.5Solvency**.  Immediately after the consummation of the transactions contemplated under this Agreement, Buyer will have positive net worth (calculated in accordance with GAAP), will not be insolvent (as defined under the U.S. Bankruptcy Code) and will have adequate capitalization to pay its debts as they mature.

     **8.6Prior Lienholders.**  As of Closing, the Prior Lienholders of Buyer are SunTrust Bank, due to a loan having a current outstanding balance of approximately Two Million Five Hundred Thousand Dollars ($2,500,000) on the date of such Closing.

**9.Survival of Representations and Warranties/ Indemnities**

     **9.1Survival of Representations and Warranties**.  All representations, warranties, and indemnifications of the parties herein set forth shall be effective as of the date of this Agreement, and shall continue in full force and effect at and shall survive the Closing for a period of thirty (30) months after the Closing Date.  All parties hereto agree that its right to obtain or obligation to provide, indemnification under this Section 9 shall extend beyond thirty (30) months after the Closing Date, until fully satisfied, for any claim for which the indemnifying party shall have received notice of claim pursuant to Section 9.4 hereof prior to the expiration of such thirty (30) month period.  Notwithstanding anything in this Agreement to the contrary, Sellers shall not have any indemnification obligation under Sections 9.2 (a) or (c) hereof unless such a claim or item is equal to or greater than $1,000 (an "**Allowed Claim**") and (ii) the aggregate amount of all Allowed Claims equals or exceeds $2,500 and then only for such amounts by which all such claims or items exceed such $2,500.

**9.2** **Indemnification by Sellers.**  Sellers hereby jointly and severally, indemnify and hold Buyer and its officers, directors, stockholders, members, managers and assignees harmless from and against any and all losses, claims, liabilities, damages or obligations including, but not limited to, any and all collection costs, reasonable attorneys' fees and other costs of litigation arising out or resulting from (a) the operation of the Business or ownership of the Purchased Assets prior to the Closing Date,  (b) any breach of any representation, warranty, covenant or agreement by a Seller or Principal set forth in this Agreement or the Security Agreement or any subordination or intercreditor agreement with any Prior Lienholders,  (c) any liabilities or obligations of a Seller or Principal other than the Assumed Liabilities; (d) any noncompliance with any federal, state or local law or regulation applicable to Sellers or any of them, in connection with the transactions contemplated herein, and (e) any actions, suits, proceedings, demands, judgments, costs, legal fees and other expenses incident to any of the foregoing.

**9.3** **Indemnification by Buyer.**  Buyer hereby indemnifies and holds Sellers, and their officers, directors, stockholders, members, managers and Principals, and each of them, harmless from and against any and all losses, claims, liabilities, damages or obligations, including, but not limited to, any and all collection costs, reasonable attorneys' fees and other costs of litigation arising out of or resulting from: (a) the operation of the Business or ownership of the Purchased Assets on and after the Closing Date; (b) any breach of any representation, warranty, covenant or agreement of Buyer set forth in this Agreement: (c) any Assumed Liabilities; (d) any noncompliance with any federal, state or local law or regulation applicable to Buyer in connection with the transactions contemplated herein, and (e) any actions, suits, proceedings, demands, judgments, costs, legal fees and other expenses incident to any of the foregoing.

**9.4** **Indemnification Process.**   Upon becoming aware of any claim for which an indemnified party is entitled to indemnification hereunder, the indemnified party shall give the indemnifying party prompt notice of such claim, with reasonable details regarding same. In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any claim or legal proceeding by a person other than the indemnified party, the indemnifying party at its sole cost and expense may, upon written notice to the indemnified party received by the indemnified party within thirty (30) calendar days after the indemnifying party's receipt of notice of such claim, assume the defense of any such claim or legal proceeding ("**Indemnified Party Controlled Claims**").  If the indemnifying party assumes the defense of any such claim or legal proceeding, the indemnifying party shall select counsel reasonably acceptable to the indemnified party to conduct the defense of such claim or legal proceeding and at its sole cost and expense shall take all steps necessary in the defense or settlement thereof.  The indemnifying party shall not consent to a settlement of, or the entry of any judgment arising from, any such claim or legal proceeding, without the prior written consent of the indemnified party (which consent shall not be unreasonably withheld, conditioned or delayed) unless the indemnifying party admits in writing its liability and agrees to hold the indemnified party harmless from and against any losses, damages, expenses and liabilities arising out of such settlement. The indemnified party shall be entitled to participate in (but not control) the defense of any such action, with its own counsel and at its own expense and shall be entitled to any and all information and documentation relating thereto.  If the indemnifying party does not assume (or continue to diligently prosecute) the defense of any such claim or litigation resulting therefrom in accordance with the terms hereof, the indemnified party

- 27 -

may defend against such claim or litigation in such manner as it may deem appropriate; provided, however, that the indemnified party shall not settle any claim or litigation without the prior consent of the indemnifying party, such consent not to be unreasonably withheld, conditioned or delayed. The indemnified party agrees that it will not waive any statute of limitations or defense that would increase the liability of the indemnifying party hereunder without the consent of the indemnifying party.

**9.5Punitive Damages, Subrogation.**   The parties hereto shall be entitled to indemnification under this Section 9 for punitive and exemplary damages only to the extent that such damages arise as a result of awards of punitive or exemplary damages against such party in favor of third parties.  Upon payment in full of any claim for indemnification under Section 9.2 or 9.3, the indemnifying party shall be subrogated to the extent of such payment to the rights of the indemnified party against any person or entity with respect to the subject matter of such third party claim.

**9.6Claim Against Escrow.**  Upon notice to Sellers specifying in reasonable detail the basis therefore, Buyer may give notice of a claim under the Escrow Agreement for any amount for which it may be entitled under this Section 9.  Neither the exercise of nor the failure to give a notice of claim under the Escrow Agreement will constitute an election of remedies or limit Buyer in any manner in the enforcement of any other remedies that may be available to it.

## 10.CONDITIONS TO THE BUYER'S OBLIGATION TO CLOSE.

The Buyer's obligation to purchase the Purchased Assets and to take the other actions required to be taken by the Buyer at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by the Buyer in whole or in part):

**10.1Accuracy of Representations**.   All of the Seller Parties' representations and warranties in this Agreement (considered collectively), and each of such representations and warranties (considered individually), shall have been accurate in all material respects as of the date of this Agreement and shall be accurate in all material respects as of the time of the Closing as if then made.

**10.2Seller Party Performance**.  All of the covenants and obligations that a Seller Party is required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of such covenants and obligations (considered individually), shall have been duly performed and complied with in all respects.  Each document to be delivered by any Seller pursuant to Section 3.2 must have been delivered.

**10.3Consents**.  Each of the Mandatory Consents listed on Schedule 4.1 hereto, the consents of the Prior Lienholders, and all other approvals, consents, ratifications, waivers or other authorizations required to be obtained at or prior to Closing in connection with the transactions contemplated by this Agreement shall have been obtained and shall be in full force and effect.

**10.4No Proceedings**.   Since the date of this Agreement, there shall not have been commenced or threatened against the Buyer or any Seller, or against any affiliate of the Buyer or any Seller, any proceeding (a) involving any challenge to, or seeking damages or other relief in connection with, any of the transactions contemplated in this Agreement or (b) that may have the effect of preventing, delaying, making illegal, imposing limitations or conditions on or otherwise interfering with any of such transactions.

**10.5No Conflict**.   Neither the consummation nor the performance of any of the transactions contemplated in this Agreement will, directly or indirectly (with or without notice or lapse of time or both), contravene or conflict with or result in a violation of or cause the Buyer or any affiliate of the Buyer to suffer any adverse consequence under (a) any applicable law, rule, regulation or order or (b) any applicable law, rule, regulation or order that has been published, introduced or otherwise proposed by or before any governmental body.

**10.6Governmental Authorizations**.   The Buyer shall have received such governmental authorizations as are necessary or desirable to allow Buyer to operate the Business and Purchased Assets from and after the Closing.

**10.7Employees**.   Those employees of the Sellers identified on Schedule 10.7 shall be available for hiring by the Buyer on and as of the Closing Date.

**10.8Interim Financial Statements**.   The Sellers shall have provided to the Buyer a balance sheet of Sellers dated as of November 2007, and if applicable, as of the end of the fiscal month of Sellers ending immediately prior to the Closing Date.

**10.9Contracts Upon Other Than Normal Terms and Conditions**.   The Buyer shall have satisfied itself that no Seller has entered into any contract or other arrangement other than in the ordinary course of business and upon substantially prevailing market prices and upon substantially prevailing other terms and conditions customary among businesses in the same type of business as the Sellers.

**10.10Material Adverse Change**.   There shall not have occurred any material adverse change in the Purchased Assets, the Assumed Liabilities, the Assumed Contracts or the financial or other condition or prospects of the Business or any or all of Sellers.

**10.11CMI Acquisition.**   Sellers shall have consummated the CMI Acquisition and assigned all rights of purchaser or buyer in connection with the CMI Acquisition, and Buyer shall have assumed the liabilities and obligations of buyer in connection with the CMI Acquisition, all in form and substance acceptable to Buyer and Sellers.

**10.12Collateral Security.**   The Security Agreement and all related documents shall be in form and substance acceptable to Buyer, Sellers and the Prior Lienholders, and such documents shall be executed and delivered by the parties thereto.

**11. CONDITIONS PRECEDENT TO SELLER'S OBLIGATION TO CLOSE**

Each Seller's obligation to sell the Purchased Assets and to take the other actions required to be taken by the Sellers at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Sellers in whole or in part):

**11.1 Accuracy of Representations**.  All of the Buyer's representations and warranties in this Agreement (considered collectively), and each of such representations and warranties (considered individually), shall have been accurate in all material respects as of the date of this Agreement and shall be accurate in all material respects as of the time of the Closing as if then made.

**11.2 The Buyer's Performance**.  All of the covenants and obligations that the Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of such covenants and obligations (considered individually), shall have been performed and complied with in all material respects. Each document to be delivered by Buyer pursuant to Section 3.3 hereof shall have been delivered.

**11.3 No Injunction**.  Since the date of this Agreement, there shall not have been commenced or threatened against any Seller or Buyer, or against any affiliate of a Seller or Buyer, any proceeding (a) involving any challenge to, or seeking damages or other relief in connection with, any of the transactions contemplated in this Agreement or (b) that may have the effect of preventing, delaying, making illegal, imposing limitations or conditions on or otherwise interfering with any of such transactions.

**11.4 CMI Acquisition.**  Sellers shall have consummated the CMI Acquisition and assigned all rights of purchaser or buyer in connection with the CMI Acquisition, and Buyer shall have assumed the liabilities and obligations of buyer in connection with the CMI Acquisition, all in form and substance acceptable to Buyer and Sellers.

**11.5 Collateral Security.**  The Security Agreement and all related documents shall be in form and substance acceptable to Buyer, Sellers and the Prior Lienholders, and such documents shall be executed and delivered by the parties thereto.

**12. TERMINATION**

**12.1 Termination Events**.  By notice given prior to or at the Closing, subject to Section 12.2, this Agreement may be terminated as follows:

(a) by mutual consent; or

(b) by the Buyer, if a material breach of any provision of this Agreement has been committed by a Seller and such breach has not been waived by the Buyer; or

(c) by a Seller, if a material breach of any provision of this Agreement has been committed by the Buyer and such breach has not been waived by the Sellers; or

\4925356.10
\4925356.11

(d)by the Buyer, if any condition in Section 10 has not been satisfied as of the date specified for Closing in Section 3.1 or if satisfaction of such a condition by such date is or becomes impossible (other than through the failure of the Buyer to comply with its obligations under this Agreement), and the Buyer has not waived such condition on or before such date; or

(e)by Sellers, if any condition in Section 11 has not been satisfied as of the date specified for Closing in Section 3.1 or if satisfaction of such a condition by such date is or becomes impossible (other than through the failure of a Seller to comply with its obligations under this Agreement), and the Sellers have not waived such condition on or before such date; or

(f)by any party hereto, if the Closing has not occurred on or before January 31, 2008 (or such later date to which the parties may agree), unless such terminating party is in material breach of this Agreement.

**12.2** **Effect of Termination.**   Each party's right of termination under Section 12.1 is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of such right of termination will not be an election of remedies.  If this Agreement is terminated pursuant to Section 12.1, all obligations of the parties under this Agreement will terminate, provided, however, that, if this Agreement is terminated because of a breach of this Agreement by the non-terminating party or because one or more of the conditions to the terminating party's obligations under this Agreement are not satisfied as a result of the non-terminating party's failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal remedies will survive such termination unimpaired.

**13.** **Post Closing Obligations and Cooperation**

**13.1** **Buyer Obligations for Hired Employees.** The parties agree that Buyer shall have the obligation to prepare and distribute all W-2's for any employee of Seller hired by Buyer as and when those W-2's are required to be filed, and Buyer shall be responsible for discharging any and all of Buyer's obligations, if any, under (a) COBRA; (b) the Worker Adjustment and Retraining Notification Act ("WARN"); (c) unemployment compensation rules and requirements, and (d) the FMLA, to the extent that such obligations arise from claims filed by Seller's former employees hired by Buyer related to the period on and following Closing.  Buyer hereby covenants to complete all such forms and file same on a timely basis.

**13.2** **Sellers' Obligations for Pre-Closing Employees.**  The parties agree that each Seller shall have the obligation to prepare and distribute all W-2's for all employees of such Seller as and when those W-2's are required to be filed related to the period prior to Closing and each Seller shall be responsible for discharging any and all of such Seller's obligations, if any, under (a) COBRA; (b) WARN ;  (c) unemployment compensation rules and requirements, and (d) the FMLA, to the extent that such obligations arise from claims filed by Seller's former employees related to the period prior to Closing. Sellers hereby covenant to complete all such forms and file same on a timely basis.

**13.3** **Access to Information.**   Buyer shall grant Sellers any and all access necessary to prepare and file W-2's for calendar year 2007.  In addition, Buyer shall cooperate with and give

- 31 -

Sellers access to all documents that Sellers may need in connection with any tax or other business issue and/or in connection with any audit of Sellers.  Sellers shall provide reasonable written notice in advance of its request and shall provide a detailed identification of that which Sellers require from Buyer in order to address any such business, tax or audit matters.  Sellers will provide Buyer with access to any business records retained by Sellers provided that Buyer requests such access during normal business hours.  Buyer agrees to retain and not destroy or discard any business record for a period of seven (7) years from the date of creation without the consent of Infinity, on behalf of Sellers.  In the event of any request by Sellers for information from Buyer, Buyer agrees to make Michael Schaab available to assist Sellers in locating such information, if he is employed by Buyer in his current role in the Business at the time of such request.

**13.4** **Transition Assistance.** Following Closing, Sellers shall actively and reasonably assist Buyer in transitioning the Business to Buyer including, but not limited to:  (a) for a reasonable period of time, assisting Buyer in notifying clients, suppliers, providers and employees of any Seller of the purchase of the Purchased Assets, and (b) executing all instruments necessary to vest all trademarks, internet domain names and other Intellectual Property in Buyer, with reasonable out-of-pocket expenses of Sellers reimbursed by Buyer.

**13.5** **Change of Names.** Within ten (10) calendar days following Closing, Sellers will change their corporate names to not use any term or derivative of their corporate or trade names, including Infinity, Infinity DR, APS and ICG, and will discontinue the use of all stationary, trade or fictitious names, invoices and all other uses of corporate names or marks included in the Purchased Assets.

**13.6** **Agreement Regarding New York Leased Real Property.**  For all periods following the Closing Date during which Buyer leases the New York Location until the end of the term of the current Space Lease, the Sellers shall be jointly and severally responsible to subsidize all rent payments for the New York Location by paying Buyer Ten Thousand Dollars ($10,000) per month, payable on the first day of each month.  Sellers may arrange for that portion of the New York Location in the northern direction, but not more than half, of the New York Location, to be occupied by a subtenant or co-tenant acceptable to Buyer, but no such co-tenancy or sub-lease shall relieve Sellers from their obligations hereunder.

**14.** **Brokers, Advisors and Consultants**

Sellers have incurred no obligation or liability, contingent or otherwise, for brokerage, advisory, consulting, finder's or other fees or commissions or other similar payment in connection with this Agreement other than Lyons Solutions, LLC, and Sellers shall jointly and severally indemnify and hold harmless Buyer from any and all claims for brokerage, advisory, consulting, finder's or other fees or commissions related to Sellers' and Principals' execution and delivery of this Agreement and the performance by Sellers and Principals of their respective obligations hereunder resulting from any contract or agreement agreed to by Sellers or Principals.  Buyer has incurred no obligation or liability, contingent or otherwise, for brokerage, advisory, consulting, finder's or other fees or commissions or other similar payment in connection with this Agreement, and Buyer shall indemnify and hold harmless Sellers and Principals from any claims for brokerage,

\4925356.10
\4925356.11

advisory, consulting, finder's or other fees or commissions related to Buyer's execution and delivery of this Agreement and the performance by Buyer of its obligations hereunder.

15. **Negative Covenants—Covenant Against Competition/Confidentiality/Remedies**

   15.1 **Covenant Against Competition and Solicitation**.  Each of the Seller Parties hereby acknowledges, recognizes and confirms that the nature of the Business is highly competitive, that the customers of the Business are located throughout the entire United States, that the covenants herein contained in this Section are part of the bargained for consideration without which Buyer would not consummate the transactions contemplated hereby, that the covenants herein will not deprive any Seller Party of a means by which he or it may earn a livelihood or otherwise cause undue hardship and that this Section is a reasonable and necessary means by which Buyer must be able to protect its legitimate business interests and the goodwill and the customer and supplier relationships of the Business to be acquired by it in connection with the transactions contemplated hereby.  Accordingly, each of the Seller Parties agrees that, subject to the terms of Section 2.4(m) hereof, it will not directly or indirectly in the Restricted Territory during the five (5) year period following the Closing Date:

   (a) engage in or prepare to engage in any "Competing Business", whether such engagement is as an officer, director, proprietor, employee, partner, manager, member, investor (other than as a passive investor in less than five percent (5%) of the outstanding capital stock of a publicly traded corporation), consultant, advisor, agent, representative, independent contractor, creditor or otherwise anywhere in the United States; or

   (b) assist others in engaging in or preparing to engage in any Competing Business in the manner described in clause (i) of this Section 15.1; or

   (c) solicit the business of, or trade with, any customers or prospective customers of a Seller who was a customer or actively sought prospective customer of such Seller during the two (2) year period immediately preceding the Closing Date, for the purpose of soliciting or consummating the sale of any products or services offered by a Seller during the two (2) year period immediately preceding the Closing Date;  provided that Fox and Forino shall be permitted to engage in such conduct in connection with the performance of their respective duties under the Principal Employment Agreements; or

   (d) induce, or otherwise solicit, any customers with whom any Seller has done business in connection with the Business to terminate or otherwise curtail or impair their business relationship with Buyer or any person, firm, corporation, or other entity in control or under control of, or under common control with, Buyer (an "Affiliate") ; unless requested by the CEO of buyer in writing; or

   (e) solicit or induce any individual who is an employee of Buyer at that time to terminate his or her employment with Buyer or offer employment to or hire or engage any such individual; or

- 33 -

(f)solicit or induce any individual who is an independent contractor of Buyer or who is engaged in any assignment on behalf of Buyer at that time to terminate his or her engagement with Buyer or offer employment to or hire or engage any such individual.

For purposes of Section 15, the phrase "Competing Business" means any individual, corporation, partnership or other entity engaged in information technology consulting, professional and administrative staffing, payrolling, vendor management and project solutions business and the phrase "Restricted Territory" means the 100-mile radius from each of the Locations as located on the Execution Date.

**15.2**<u>Confidentiality</u>.

(a)Unless and until this Agreement is terminated pursuant to Section 12 hereof and after the Effective Time, each of Sellers and Principals jointly and severally agree to not use any of the Confidential Information as defined in <u>Exhibit "A"</u> for its or their benefit or for the benefit of any other person or company other than Buyer or to disclose any Confidential Information to any person for a period of five (5) years after the Closing Date, subject to Subsections 15.2(b) and 15.2(c) below and except to any such Seller's agents, attorneys and advisors ("Representatives") who have a need to use such Confidential Information provided that such Representatives are and remain bound to the terms of this Section 15.2. Sellers and Principals agree that the Confidential Information is a valuable, special and unique asset of the Business that Sellers gained access to, and knowledge of, by virtue of the ownership of the Business.

(b)In the event any Seller or Principal becomes legally required to disclose any Confidential Information in a manner other than expressly permitted by this Agreement, such Seller or Principal shall provide Buyer with prompt notice thereof, so that Buyer may seek a protective order or other appropriate remedy.  Sellers and Principals will cooperate with Buyer, at the sole expense of Buyer, in seeking any such order or other remedy, and Sellers and Principals shall disclose only that portion of the Confidential Information that they are legally required to disclose and in doing so, notwithstanding anything to the contrary contained herein, shall incur no liability to Buyer as a result of disclosure of Confidential Information that it is legally required to disclose; otherwise, nothing in this Agreement is intended to limit in any way the duty and obligation of each Seller and Principal to Buyer under statutory or case law not to disclose or make use of Confidential Information.

(c)Sections 15.2(a) and 15.2(b) do not apply to that part of the Confidential Information that Sellers demonstrate (a) was, is or becomes generally available to the public other than as a result of a breach of this Section 15.3; (b) was or is developed by a Seller independently of and without reference to any Confidential Information; or (c) was, is or becomes available to a Seller on a non-confidential basis from a third party not bound by a confidentiality agreement or any legal, fiduciary or other obligation restricting disclosure, (d) was filed with any governmental agencies or released to any consultant, advisor or consultant to Sellers in connection with the payment of taxes;or (e) was used or disclosed by Fox in compliance with the Fox Employment Agreement; or (f) to enforce such Seller's rights under any Transaction Documents.  Sellers shall

- 34 -

not disclose any Confidential Information of Sellers relating to any of the Business, Purchased Assets or the Assumed Liabilities in reliance on the exceptions in clauses (b) or (c) above.

**15.3 Remedies for Breaches of Section 15.**

(a) **Equitable Relief; Rights Cumulative**.  The Seller Parties acknowledge and agree that Buyer's remedy at law for a breach or threatened breach of any of the provisions of Sections 15.1 and 15.2 would be inadequate and, in recognition of that fact, in the event of a breach or threatened breach by any Seller Party of the provisions of Sections 15.1 and 15.2, it is agreed that, in addition to its remedies at law, Buyer shall be entitled to equitable relief in the form of specific performance, temporary restraining order, temporary, preliminary, or permanent injunction, or any other equitable remedy which may then be available, including but not limited to an equitable accounting of all earnings, profits and other benefits arising from or in connection with such violation, in each case without the need to post bond.  The Seller Parties agree not to oppose Buyer's request for any of the above relief on the grounds that Buyer has not been irreparably injured or that Buyer has an adequate remedy at law or that such equitable relief is inappropriate.  Nothing set forth in this Section 15.3 shall be construed as prohibiting Buyer from pursuing any other rights and remedies available to it for such breach or threatened breach pursuant to Section 15.

(b) **Severability**.  If any portion of the covenants in Section 15 is held to be invalid or unenforceable because of geographic area, time, or for any other reason, such holding shall not affect the validity or enforceability of the remaining portions of Section 15 or prevent enforcement of restrictions thereof to the extent a court of competent jurisdiction may consider reasonable.

(c) **Accounting**.  In addition to, and not as a limitation upon, Section 15 hereof, the parties to this Agreement agree that if a breach of any covenant in Section 15.1 or 15.2 occurs, the injured party shall be entitled to an accounting and repayment of all profits, compensation, commissions, remuneration or other quantifiable benefit that the breaching party directly or indirectly has realized as a result of, or arising out of, or in connection with, any such breach.

(d) **Tolling**.  If any of the covenants contained in Section 15 are breached, then the applicable restricted period shall be extended for a period of time equal to the period of time during which such breach is subsisting.

(e) **Other Remedies**.  In the event of a breach or violation of this Section 15, Buyer shall also have all of its rights and remedies at law and in equity.

(f) **Acknowledgements**.  Notwithstanding anything to the contrary contained in this Agreement, the Parties agree that the amount of the Purchase Price as set forth in Section 2 shall (a) not be construed to limit the damages which Buyer may recover as a result of a breach of any of the covenants in Section 15, and (b) not be used as a defense or evidence by a Seller Party in any proceeding to enforce the covenants contained in Section 15.

(g)**Essential Consideration**.  The covenants in Section 15 are essential components of the consideration received by Buyer under this Agreement, and Buyer would not have executed and delivered this Agreement but for such undertakings by Seller Parties.

**16.** **Miscellaneous Provisions**

    **16.1** **Notices**.  All notices hereunder shall be in writing and delivered personally or mailed by certified mail, postage prepaid, addressed to the respective parties at the following addresses (or at such other address as shall be given in writing by any party to the other):

| | |
|---|---|
| If to Buyer: | American Cybersystems, Inc.,<br>100 Crescent Center Parkway, #200<br>Tucker, GA  30084<br>Telephone:  (770) 493-5588<br>Facsimile:  (770) 493-5586 |
| If to Sellers: | Luigi Forino<br>211 Doris Ave<br>North Bellmore, NY 11710 |
| If to Principals: | Luigi Forino<br>235 Island Parkway<br>Island Park, NY 10123 |
| | Adam B. Fox<br>340 East Bird Village Road<br>Jackson, NJ 08527 |

    **16.2** **Remedies**.

    (a)In the event of a breach by Sellers of the representations and warranties in this Agreement or any Transaction Documents or breach by any Seller Party of any other terms, conditions, obligations or covenants in this Agreement or any Transaction Documents, Buyer shall be entitled, if it shall so elect and without waiver of any other rights it may have at law or equity, to: (i) institute legal proceedings to obtain damages for any such breach to the extent of such breach and (ii) enforce the specific performance of this Agreement or Transactions Documents by Sellers and Principals and to enjoin Sellers and Principals from any further violation of this Agreement or Transaction Documents. No remedy conferred upon Buyer by this Agreement or Transactions Documents is intended to be exclusive of any other remedy and each remedy shall be cumulative and shall be in addition to any other remedy given hereunder or therein or now or hereafter existing at law or in equity.

    (b)    In the event of a breach by Buyer of the representations and warranties of Buyer or the terms of this Agreement, Sellers and Principals shall be entitled, if they shall so elect and without waiver of any other rights they may have at law or equity, to: (i) institute legal proceedings to

- 36 -

obtain damages for any such breach to the extent of such breach, and (ii) enforce the specific performance of this Agreement by Buyer and to enjoin Buyer from any further violation of this Agreement. No remedy conferred upon Sellers or Principals by this Agreement is intended to be exclusive of any other remedy and each remedy shall be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity.

(c)     Notwithstanding anything herein or in any Transaction Document to the contrary, in the absence of fraud or intentional misrepresentation by Sellers of which any Principal has actual knowledge of such fraud or intentionally misrepresentation, Principals shall have no liability or obligation to Buyer for any breach of any representation, warranty, covenant or other term or condition to Buyer in this Agreement except the covenants and agreements in Sections 2.4 (e), and 15 hereof.

**16.3** **Successors and Assigns**.  This Agreement, and all rights and powers granted hereby, will bind and inure to the benefit of the parties hereto and their respective heirs, beneficiaries, successors and assigns.  No party hereto may assign any of its rights or obligations hereunder, except that upon the consent of Sellers (which consent may not be unreasonably withheld or delayed) Buyer may assign all of its rights and obligations hereunder and under any Transaction Documents to which such Sellers are parties, to any third party; whereupon Buyer shall be released from its obligations hereunder.  This Agreement is for the sole benefit of the parties hereto and their respective heirs, beneficiaries, successors and assigns and nothing herein provided or implied shall give or be construed to give any person or entity, other than the parties hereto and their respective heirs, beneficiaries, successors and assigns, any legal or equitable rights hereunder.

**16.4** **No Partnership**.  The parties acknowledge that this Agreement and any provision hereof shall not be deemed to establish any joint venture, partnership or other relationship with respect to Buyer, Sellers or Principals.  No creditor of any Seller shall be entitled to recourse against Buyer under any circumstance as to obligations for which such Seller continues to be responsible pursuant to the provisions of this Agreement.  In the event that Buyer chooses to pay any funds payable by a Seller to providers of goods or services or to creditors of such Seller directly, Buyer shall not be liable for the order or priority of such payments nor shall Buyer be deemed to assume any obligation of such Seller to such providers or creditors except to the extent provided herein.

**16.5** **Expenses**.  Except as herein otherwise provided, each of the parties hereto shall pay its own legal, accounting, brokerage and other expenses and charges incident to the drafting, negotiation and delivery of this Agreement and the consummation of the transactions contemplated thereby.

**16.6** **Headings/Captions: Construction**.  Headings or captions in this Agreement are for convenience only and shall not be used to interpret or construe its provisions.  All references to "Articles" or "Sections" or "Subsections" refer to the corresponding Articles or Sections or Subsections of this Agreement.  All words used in this Agreement will be construed to be of such gender or number, as the circumstances shall require.

- 37 -

**16.7Governing Law.**   THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, without regard to principles of conflicts of laws of such state.

**16.8Jurisdiction and Venue.**  Each party hereto irrevocably and unconditionally (a) agrees that any suit, action or other legal proceeding arising out of this Agreement may be brought in a court of general jurisdiction in New York County, New York, or, if any such court does not have or will not accept jurisdiction, the United States District Court for the Northern District of Georgia, Atlanta Division or for the Eastern District of New York, (b) consents to the jurisdiction of any such court in any such suit, action or proceeding, and (c) waives any objection which such party may have to the laying of venue of any such suit, action or proceeding in any such court.

**16.9Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same instrument.  The exchange of copies of this Agreement and of signature pages by facsimile transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes.  Signatures of the parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

**16.10Time of Essence**.  Subject to the terms and conditions hereof, time is of the essence of this Agreement.

**16.11Severability**.  If any court of competent jurisdiction holds any provision of this Agreement unenforceable, the other provisions of this Agreement will remain in full force and effect.  Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

**16.12Waiver**.  The rights and remedies of the parties to this Agreement are cumulative and not alternative except as otherwise provided herein.  Neither the failure nor any delay by any party in exercising any right, power or privilege under this Agreement or the documents referred to or attached hereto will operate as a waiver of such right, power, or privilege, and no single or partial exercise of such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other, right, power, or privilege.  To the maximum extent permitted by applicable law: (a) no claim or right arising out of this Agreement or the exhibits or schedules attached hereto or the documents referred to or attached hereto can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by all parties, (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given, and (c) no notice or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in the Agreement or the documents referred to in this Agreement.

**16.13Additional Assurances**.  Each party agrees that it will, at any time before and after the Closing, execute and deliver all additional documents, and do any other acts or things that may be reasonably requested by the other party in order to further or better effectuate or evidence the

terms hereof, all as reasonably requested by such other party and all without expense or undue hardship to such other party.

**16.14 Entire Agreement**.  This Agreement, including the exhibits and schedules attached hereto and any other documents and agreements referenced herein and expressly made a part hereof, contains the entire understanding of the parties hereto with respect to the purchase of the Purchased Assets set fully forth in Exhibit "A" and the assumption of the Assumed Contracts as fully set forth in Exhibit "B." This Agreement supersedes all other prior agreements, correspondence, conversation, negotiations, term sheets and understandings between the parties with respect to such subject matter except as otherwise incorporated herein.

**16.15 Amendments**.  This Agreement may not be changed orally, but only by an agreement in writing signed by all of the parties hereto, and no waiver of compliance with any provision or condition hereof and no consent provided for herein shall be effective unless evidenced by an instrument in writing duly executed by the party hereto seeking to be charged with such waiver or consent.

**16.16 Public Announcements**.  Sellers and Principals agree to coordinate and cooperate in respect of any public announcement they desire to make concerning this Agreement and the transactions contemplated herein.

**16.17 Confidentiality of Transaction**.  From and after the Closing Date, Sellers, Buyer and Principals mutually agree not to discuss the purchase price to be paid by Buyer or other terms and conditions of this Agreement with any current or former employees of Sellers that are or were employees prior to the Closing Date and/or subsequent to the Closing Date become employees of Buyer or with any third parties, except:  (a) any of a Seller's, Buyer's and Principal's respective attorneys, accountants, and financial and other professional advisors, provided that they agree to retain such in confidence and to utilize such information only for purposes of advising their respective clients, (b) the IRS, the State of Georgia, the State of New Jersey, the State of New York (including the New York State Department of Taxation and Finance) or their agents or successors in interest, or (c) as required by law or legal process without the written approval of all parties to this Agreement. In the event that a party is served with such legal process or otherwise compelled to disclose information the subject of this Paragraph 16.17, it shall give the other party prompt notice thereof, so as to permit that party to enter timely objections to such compelled disclosure.

**16.18 No Third Party Beneficiaries**.  Except as to any rights expressly conferred upon any person that is not a party to this Agreement, no person or entity that is not a party to this Agreement shall have any rights or claims hereunder as a third party beneficiary, including as to any claim against any Buyer to pay any liabilities associated with any Purchased Assets, Assumed Contracts or this Agreement.

**16.19 Consultation with Legal Counsel**.    SELLERS AND PRINCIPALS INDIVIDUALLY AND ON BEHALF OF SELLERS ACKNOWLEDGE THAT EACH HAS CONSULTED WITH LEGAL COUNSEL OF THEIR OWN CHOOSING IN CONNECTION WITH THE PREPARATION AND EXECUTION OF THIS AGREEMENT AND THAT EACH

\4925356.10
\4925356.11

HAS READ AND UNDERSTANDS THE FOREGOING PROVISIONS AND AGREES THAT SUCH PROVISIONS ARE REASONABLE AS WRITTEN AND ARE INTENDED TO BE FULLY ENFORCEABLE.

BUYER ACKNOWLEDGES THAT IT HAS CONSULTED WITH LEGAL COUNSEL OF ITS CHOOSING IN CONNECTION WITH THE PREPARATION AND EXECUTION OF THIS AGREEMENT AND THAT IT HAS READ AND UNDERSTANDS THE FOREGOING PROVISIONS AND AGREES THAT SUCH PROVISIONS ARE REASONABLE AS WRITTEN AND ARE INTENDED TO BE FULLY ENFORCEABLE.

~\4925356.10
\4925356.11

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on the day and year first above written.

SELLERS:

Infinity Consulting Group, LLC
By: _____
Title: _____

Infinity Consulting Group Latin America
By: _____
Title: _____

APS/Bold Staffing, Inc.
By: _____
Title: _____

ICG of America, LLC
By: _____
Title: _____
Date: _____

PRINCIPALS:

Luigi Forino, Individually
_____

Adam B. Fox, Individually
_____

PURCHASER:

American Cybersystems, Inc.
By: _____
Title: _____

- 41 -

EXHIBIT "A"

**Purchased Assets**

The Purchased Assets shall include the following assets of Sellers related to the Business:

1. all unbilled work in progress, pipelines for temporary employees and permanent placement candidates;

2. all cash, cash equivalents, deposit accounts and long and short term securities of Sellers;

3. all Accounts Receivable as defined in Paragraph 5.2;

4. the amount of all reserves, prepaid deposits, security deposits, employee advances, refunds, credits due and prepaid expenses as of the Closing for all contracts or permits or otherwise relating to the Purchased Assets or the operation of the Business;

5. all purchase orders, master services agreements, statements of work and written contracts, including, but not limited to any such contracts with all of each Seller's clients, and contracts, agreements, commitments, instruments, bids and proposals to which a Seller is a party with any customers or prospective customers or providers or prospective providers of goods and services to a Seller;

6. all books and records (financial or otherwise) pertaining to the Business;

7. all telephone numbers, including those of the Business of Sellers, including, but not limited to, telephone/fax numbers:  (212) 967-0300, (212) 967-2828, (732) 593-0200, (732) 593-0211, and (809) 261-5103

8. the domain names 'infinitygroup.com, provms.com, iusergroups.com and all other domain names used in the Business.

9. the corporate names Infinity, Infinity DR, APS and ICG, and any derivation thereof

10. all tangible assets used in the Business, including, but not limited to, furniture, fixtures, and equipment (as listed on Exhibit A-1), plants, art work, office supplies, stationery, refrigerators, air conditioners, heaters, fans, coffee making equipment, decorations and signs;

11. all owned and leased (subject to such leases) business equipment including telephones, switchboards, telephone terminals, facsimile transmission (fax) machines, projectors, copying machine(s) and all related equipment and supplies;

12. all computers and all related equipment including, printers, modems and routers, projectors and disk drives owned by a Seller;

13. all keys, combinations, security devices, and codes for or with respect to all real property, storage units, vaults, safe deposit boxes and all instruments, assignments or documents required to transfer all of a Seller's right, title and interest in the same;

\4921657.1
\4925356.10
\4925356.11

14. all **"Confidential Information"** owned by a Seller or which a Seller has the right to use, including all know-how, trade secrets and other confidential or non-public information prepared for, by or on behalf of, or in the possession of a Seller, including (a) non-public proprietary information, (b) other information derived from reports, investigations, research, studies, work in progress, codes, marketing, sales or service studies or programs, capital expenditure projects, cost summaries, equipment, product or system designs or drawings, pricing or other formulae, sales and marketing techniques, contract analysis, financial information, projections, customer lists, customer studies and analyses, training materials, credit studies, opinion polls, evaluations of employees, customer studies, agreements with vendors, joint venture agreements, confidential filings with any agency, court, or other governmental authority, and (c) all other concepts, methods, techniques, and processes of doing business, ideas or information that can be used in the operation of a business or other enterprise and is sufficiently valuable, or potentially valuable, and secret to afford an actual or potential economic advantage over others.  Confidential Information does not include any information: (x) that currently is generally available to and generally known by the public or, through no fault of a Seller, hereafter becomes generally available to and generally known by the public, (y) becomes known to the recipient through disclosure by sources other than the disclosing party having the right to disclose such information, or (z) is required to be disclosed pursuant to the requirement of a governmental agency or any law requiring disclosure thereof, *provided that* the party whose Confidential Information is to be disclosed is provided with timely prior written notice of any such required disclosure and given the opportunity to object to same;

15. all **"Intellectual Property"** owned by a Seller or which a Seller has the right to use, including all trade names, trademarks, service marks, logos, patents, copyrights (including any registrations, applications, licenses or other rights relating to any of the foregoing), and proprietary technology, trade secrets, inventions, know-how, designs, drawings, computer programs (including source codes and algorithms), ProView software (including source codes and algorithms), calibration processes, practices and operations, manufacturing instructions and other proprietary intangible properties and rights relating to the use of an item (including all prototypes, works-in-progress and inventories of each Item) and all intellectual property listed in Exhibit A-1;

16. all advertising, marketing and promotional materials and fixtures and equipment used in connection with sales, marketing and promotion;

17. all owned computer programs and software licensed to a Seller used in the Business as of August 31, 2007 and related data, including but not limited to the ProView software.

18. except to the extent a part of Excluded Assets, all copies of business and financial records of Sellers (whether in electronic, paper or other format), including, (a) all files and records pertinent, relevant (to the best of each Seller's knowledge) connected with the Business and the rendition of services by a Seller, (b) all agreements, orders, requirements, and inquiries from or with past, current or prospective customers, all customer files including but not limited to, rolodexes, lists, directories and records of sales calls and follow-ups made in connection with the solicitation of business, (c) subject to applicable law, all files related to the recruitment and placement of temporary employees, including payroll and personnel records, including I-9 documentation, reports of assignments and engagements, (d) subject to applicable law, all files related to the staff employees of a Seller, (e) all files related to the permanent placement or recruiting business of a Seller, (f) all customer records, books of account, supplier lists; maintenance records, (g) all engagement, placement or other agreements with prospective temporary or staff employees, and (h) all third party vendor and vendor management contracts;

19. all employee manuals and handbooks;

20. all operating procedures, policy and procedure manuals and training materials and sales and marketing materials;

21. all lists of independent contractors, suppliers and related correspondence and files;

22. all permits, licenses and governmental approvals required to conduct any part of the Business of a Seller as the same existed on August 31, 2007 to the extent that such are transferable;

23. all claims for damages against insurance companies that relate to any of the tangible Purchased Assets to the extent such damages have not been repaired;

24. all of each Seller's goodwill and related doing business as ("dba") filings; and

25. all assets in connection with the CMI Acquisition.

Except as otherwise defined in this Exhibit, capitalized words and letters shall have the meaning given to them in the Asset Purchase Agreement to which this Exhibit is attached.

\4925356.10
\4925356.11

**EXHIBIT "B"**

**ASSIGNED CONTRACTS**

All rights and obligations arising from and after midnight on August 31, 2007 under the following:

1. All leases for tangible assets used in connection with Sellers' Business, as the same exist on August 31, 2007, including, without limitation, leases for copiers, fax machines, and similar devices and all leases for computer equipment.

2. All Intellectual Property licenses including assignments of rights thereunder and consents thereto.

3. All written or oral contracts, agreements, commitments, instruments, guaranties, bids and proposals to which a Seller is a party with any customers for which or whom Seller performed services in the preceding twelve (12) months or, in the case of bids or proposals, any prospective customers, including without limitation all unfilled orders outstanding as of the Effective Time for the sale of services by a Seller.

4. All written or oral contracts, agreements, commitment, or other documents with any provider of goods or services, to a Seller including those with providers of utilities, security and maintenance services, in the preceding twelve (12) months entered into in the ordinary course of business by a Seller.

5. All independent contractor agreements, employment, non-competition, non-solicitation and confidentiality agreements with staff and temporary employees.

Except as otherwise defined in this Exhibit, capitalized words and letters shall have the meaning given to them in the Asset Purchase Agreement to which this Exhibit is attached.

EXHIBIT "C"

## Promissory Note

**Date:  January __, 2008**

**Amount:  $500,000**

| | |
|---|---|
| Sellers: | Buyer: |
| **Infinity Consulting Group, LLC**<br>**Infinity Consulting Group Latin America**<br>**APS/Botal Staffing Inc.**<br>**ICG of America, LLC**<br>c/o Infinity Consulting Group, LLC<br><br>_____<br>_____<br>_____ | **American Cybersystems, Inc.**<br>100 Crescent Center Parkway, Suite 200<br>Tucker, GA  30084 |

**FOR VALUE RECEIVED,** the undersigned Buyer unconditionally promises to pay Infinity Consulting Group, LLC, for itself and as agent for Sellers ("Agent"), at its offices indicated at the beginning of this Note, or at such other place as may be designated by Agent, the principal amount of **Five Hundred Thousand and 00/100 Dollars** ($500,000) in accordance with the payment schedule indicated below.  This Promissory Note is given pursuant to Section 2.3 of that certain Asset Purchase Agreement between Buyer and Sellers of even date herewith ("Sale Agreement") and is the Promissory Note referred to in, and entitled to the benefits of, the Security Agreement. Except as otherwise defined herein, capitalized words and letters shall have the meaning ascribed to them in the Sale Agreement.

1.    **Payment Schedule.**  All payments received hereunder shall be applied first to the payment of any expense or charges payable hereunder or under any other loan documents executed in connection with this Note (with the exception of expenses related to preparation of this Note or the Sale Agreement of even date herewith) with the balance applied to principal, or in such other order as Sellers shall determine at its option.

2.    **Monthly Payments.**  Subject to Section 2.6 of the Sale Agreement, principal and interest due hereunder shall be paid in thirty-six (36) equal monthly payments of principal and interest, beginning April 1, 2008, with interest accruing at an annual rate of seven percent (7%).  The monthly payment shall be made on the first Business Day of each month in the amount of Fifteen Thousand Four Hundred Thirty-Eight and 55/100 Dollars ($15,438.55). In the event that any payment due under this Note is paid more than ten (10) days after the date on which such payment is due, a late fee equal to five percent (5%) of the unpaid payment shall become immediately due and payable.  For purposes hereof, "Business Day" shall mean any day other than a Saturday, Sunday or other day on which commercial banks

in New York, New York are required or authorized by law to be closed.

3.  **Events of Default.**  The following are events of default hereunder:  (a) the failure to pay or perform any obligation, liability or indebtedness of Buyer to Sellers under this Note or the Sale Agreement or any Transaction Documents, as and when due (whether upon demand, at maturity or by acceleration); (b) the commencement of a proceeding against Buyer for dissolution or liquidation, or the voluntary or involuntary termination or dissolution of Buyer; or (c) the insolvency of, the business failure of, the appointment of a custodian, trustee, liquidator or receiver for, or for any of the property of, the assignment for the benefit of creditors by, or the filing of a petition under bankruptcy, insolvency or debtor's relief law or the filing of a petition for any adjustment of indebtedness, composition or extension by or against Buyer.

4.  **Remedies upon Default.**  Whenever there is a default by Buyer under this Note or the Sale Agreement, and after Sellers have given Buyer ten days' notice (via overnight delivery) and an opportunity to cure, (a) the entire balance outstanding hereunder and all other obligations of Buyer to Sellers (however acquired or evidenced) shall, at the option of Sellers, become immediately due and payable, and/or (b) to the extent permitted by law, the rate of interest on the unpaid principal shall be charged at Sellers' discretion up to the maximum rate allowed by law, or if none, twelve percent (12%) per annum (the "Default Rate"), and/or (c) Sellers may exercise all rights under the Security Agreement.  The provisions herein for a Default Rate shall not be deemed to extend the time for any payment hereunder or to constitute a "grace period" giving Buyer a right to cure any default.  At Sellers option, any accrued and unpaid principal, fees or charges may, for purposes of computing and accruing interest at the Default Rate hereunder on a daily basis after the due date of the Note or any installment thereof, be deemed to be a part of the principal balance, and interest at the Default Rate shall accrue on a daily compounded basis after such date at the Default Rate provided in this Note until the entire outstanding balance of principal is paid in full.  Additionally, Sellers shall have all rights and remedies available under the Sale Agreement, Security Agreement, as well as all rights and remedies available at law or in equity.

5.  **Non-Waiver.**  The failure at any time of Sellers to exercise any of its options or any other rights hereunder shall not constitute a waiver thereof, nor shall it be a bar to the exercise of any of its options or rights at a later date.  All rights and remedies of Sellers shall be cumulative and may be pursued singly, successively or together, at the option of Sellers.  The acceptance by Sellers of any partial payment shall not constitute a waiver of any default or of any of Sellers rights under this Note.  No waiver of any of its rights hereunder, and no modification or amendment of this Note, shall be deemed to be made by Sellers unless the same shall be in writing, duly signed on behalf of Sellers; each such waiver shall apply only with respect to the specific instance involved, and shall in no way impair the rights of Sellers or the obligations of Buyers to Sellers in any other respect at any other time.

\4927042.3
\4925356.6

\4925356.10
\4925356.11

6.   **Applicable Law, Venue and Jurisdiction**.  This Note and the rights and obligations of Buyer and Sellers shall be governed and interpreted in accordance with the laws of the State of New York.  In any litigation in connection with or to enforce this Note or any endorsement or guaranty of this Note or any loan documents, Sellers and Buyer irrevocably consent to and confers personal jurisdiction of the courts of the State of New York, with venue in New York County, New York, or the courts of the United States located within the State of New York and expressly waive any objections as to venue in any such courts.  Nothing contained herein shall, however, prevent Sellers from bringing any action or exercising any rights within any other state or jurisdiction or from obtaining personal jurisdiction by any other means available under applicable law.

7.   **Partial Invalidity**.  The unenforceability or invalidity of any provision of this Note shall not affect the enforceability or validity of any other provision herein and the invalidity or unenforceability of any provision of this Note or of the loan documents to any person or circumstance shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances.

8.   **Binding Effect**.  This Note shall be binding upon and inure to the benefit of Buyer and Sellers and their respective successors, assigns, heirs and personal representatives, provided, however, that no obligations of Buyer hereunder can be assigned without prior written consent of Sellers except to any Affiliate or assignee of, or successor to, Buyer provided, however, that no such assignment shall relieve Buyer from its obligations hereunder.

9.   **Costs of Collection**.  Buyer agrees to pay Sellers the reasonable costs of collection including reasonable attorneys' fees and costs, actually incurred by Sellers to collect this Note.

10.  **Undertaking to Agent.**  Without prejudice to its obligations under this Note or the Sale Agreement, Buyer undertakes with Agent and Sellers to pay SUNTRUST BANK, as escrow agent under the Escrow Agreement as defined in the Sale Agreement, all amounts payable by it to or for the account of Sellers pursuant to this Note for the duration of any such Escrow Agreement, and thereafter to Agent.  Any such payment made by Buyer to Escrow Agent or Agent shall pro tanto satisfy the Buyer's obligations to make payments to or for the account of Sellers pursuant to this Note.

11.  **Notices.**  All notices and other communication in connection with this Note shall be given pursuant to Section 16.1 of the Sale Agreement.

**Executed under seal by Buyer as of the day and year first above written.**

**Buyer:**

**American Cybersystems, Inc.**

7

\4927042.3
\4925356.6

~~\4925356.10~~
\4925356.11

By:_____(Seal)

**Name:** _____

**Title:** _____

8

\4927042.3
\4925356.6

\4925356.10
\4925356.11

EXHIBIT "D"

BILL OF SALE

EXHIBIT "E"

ACCOUNTS RECEIVABLE

- 10 -

**SCHEDULE 1.3**

**ASSUMED PAYABLES**

- 11 -

\
\4925356.10
\4925356.11

## SCHEDULE 4.1

## THIRD PARTY CONSENTS/SIGNIFICANT CLIENTS


**SEE EXCEL SPREADSHEET OF SCHEDULE 4.1 ATTACHED HERETO**

\
~~\4925356.10~~
\4925356.11

**SCHEDULE 7.2(b)**

**LAWSUITS, INVESTIGATIONS AND PROCEEDINGS**

Thirty One Co. V. Luigi Forino And Infinity Consulting Group, Inc. A/K/A Infinity Consulting Group of New York, Inc. A/K/A Infinity Consulting Group, LLC, Supreme Court of the State of New York, County of New York, Index Number:  604355/04

ASI System Integration, Inc. v. Infinity Consulting Group, LLC, Supreme Court of the State of New York, County of New York, Index Number 105007/06

\
\4925356.10
\4925356.11

## SCHEDULE 7.2(d)

## FINANCIAL STATEMENTS

**See Attached:**

2005 Profit and Loss and Balance Sheet - reviewed.
2006 Profit and Loss and Balance Sheet - reviewed.
2007 through August 31, 2007 – Sellers'management internal financials.

- 14 -

\
\4925356.10
\4925356.11

**SCHEDULE 10.7**

**SELLERS' EMPLOYEES AVAILABLE AS OF CLOSING DATE**

[Identify]

- 15 -

Document comparison done by DeltaView on Monday, January 07, 2008 6:53:05 PM

| Input: | |
|---|---|
| Document 1 | interwovenSite://ATLDMS/Active/4925356/10 |
| Document 2 | interwovenSite://ATLDMS/Active/4925356/11 |
| Rendering set | MW Standard |

| Legend: | |
|---|---|
| **Insertion** | |
| ~~Deletion~~ | |
| ~~Moved from~~ | |
| Moved to | |
| Style change | |
| Format change | |
| ~~Moved deletion~~ | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 37 |
| Deletions | 35 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 72 |